1  J. DANIEL SHARP (SBN 131042)
   jsharp@crowell.com
2  MARK T. JANSEN (SBN 114896)
   mjansen@crowell.com
3  CROWELL & MORING LLP
   275 Battery Street, 23rd Floor
4  San Francisco, CA 94111
   Telephone: 415.986.2800
5  Facsimile: 415.986.2827

6  MARK A. ROMEO (SBN 173007)
   mromeo@crowell.com
7  DEREK S. HECHT (SBN 273039)
   dhecht@crowell.com
8  CROWELL & MORING LLP
   3 Park Plaza, 20th Floor
9  Irvine, CA 92614
   Telephone: 949.263.8400
10 Facsimile: 949.263.8414

11 Attorneys for Plaintiff and Counterclaim Defendant
   THE REGENTS OF THE
12 UNIVERSITY OF CALIFORNIA

13              UNITED STATES DISTRICT COURT

14            SOUTHERN DISTRICT OF CALIFORNIA

15

16 THE REGENTS OF THE                Case No. 15-CV-01766-BEN-BLM
   UNIVERSITY OF CALIFORNIA, a
17 California Corporation,           **FIRST AMENDED COMPLAINT
                                     FOR MONEY DAMAGES AND
18              Plaintiff,           EQUITABLE RELIEF FOR:**

19         v.                        1. **BREACH OF FIDUCIARY
                                        DUTY;**
20 PAUL S. AISEN, an individual;     2. **BREACH OF DUTY OF
   JEREMY PIZZOLA, an individual;       LOYALTY BY EMPLOYEE;**
21 DEBORAH TOBIAS, an individual;    3. **AIDING AND ABETTING
   GUSTAVO JIMENEZ-                     BREACH OF FIDUCIARY DUTY
22 MAGGIORA, an individual;            AND DUTY OF LOYALTY;**
   PHUOC HONG, an individual;       4. **INTERFERENCE WITH
23 HONG MEI QIU, an individual;        CONTRACT;**
   STEFANIA BRUSCHI, an            5. **INTERFERENCE WITH
24 individual; JIA-SING SO, an         PROSPECTIVE ECONOMIC
   individual; MAYYA NESSIRIO, an      ADVANTAGE;**
25 individual; ELIZABETH SHAFFER,   6. **CONVERSION;**
   an individual; DEVON GESSERT,    7. **COMMISSION OF COMPUTER
26 an individual, KELLY HARLESS,       CRIMES;**
   an individual; UNIVERSITY OF     8. **VIOLATION OF GOV'T CODE §
27 SOUTHERN CALIFORNIA, a             87100;**
   California Corporation; and DOES 1-
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

| | |
|---|---|
| 1 | 25, Inclusive, |
| 2 | Defendants. |

**9.  VIOLATION OF GOV'T CODE § 87407; and**

**10. CIVIL CONSPIRACY**

**DEMAND FOR JURY TRIAL**

3  PAUL S. AISEN, an individual; and UNIVERSITY OF SOUTHERN
4  CALIFORNIA, a California Corporation,

5

6  Counterclaim Plaintiffs,

7  v.

8  THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a
9  California Corporation; DR. WILLIAM C. MOBLEY, an
10  individual; and DOES 1-25, Inclusive,

11

12  Counterclaim Defendants.

13      Plaintiff and Counterclaim DefendantThe Regents of the University of

14  California alleges upon knowledge as to its own actions, and upon information and

15  belief as to all other matters, against Defendants Paul S. Aisen, Jeremy Pizzola,

16  Deborah Tobias, Gustavo Jimenez-Maggiora, Phuoc Hong, Hong Mei Qiu, Stefania

17  Bruschi, Jia-Sing So, Mayya Nessirio, Elizabeth Shaffer, Devon Gessert, and Kelly

18  Harless, and the University of Southern California as follows:

19                          **THE PARTIES**

20      1.      The Regents of the University of California ("The Regents" or

21  "Plaintiff") is a California corporation doing business in the County of San Diego,

22  State of California.

23      2.      Defendants Paul S. Aisen ("Aisen"), Jeremy Pizzola, Deborah Tobias,

24  Gustavo Jimenez-Maggiora, Phuoc Hong, Hong Mei Qiu, Stefania Bruschi, Jia-Sing

25  So, Mayya Nessirio, Elizabeth Shaffer, Devon Gessert, and Kelly Harless

26  (sometimes collectively referred to as "Individual Defendants") are and were at all

27  relevant times individuals residing in the County of San Diego, State of California.

28

3.      Defendant University of Southern California ("USC") is a California corporation doing business in the Counties of Los Angeles and San Diego, State of California.

4.      Plaintiff is informed and believes and thereon alleges that each of the Defendants fictitiously sued hereunder as Does 1 through 25 are in some manner responsible for the occurrences alleged hereunder and the damages which Plaintiff alleges hereunder, and that at all times, each of said Does were acting as the agent for each other or the Defendants within the scope and capacity of said agency. Plaintiff is ignorant of the true names and capacities of such Defendants sued herein as Does 1 through 25 inclusive and therefore sues these Defendants by such fictitious names for the same acts and causes of action alleged against Defendants. Plaintiff will seek leave of Court to amend this First Amended Complaint ("FAC") to allege the true names and capacities of said Defendants at such time as they may be ascertained.

## JURISDICTION AND VENUE

5.      The conduct alleged herein occurred within the County of San Diego, State of California.  Although Defendants removed this case to federal court, The Regents contest that this Court has jurisdiction over this matter.  The Regents properly filed this action in the Superior Court of the State of California, where it should remain.  The Regents have filed a motion to remand this action to the Superior Court.  Until this Court remands the action, however, the Regents has no choice but to file this FAC with this Court pursuant to Fed. Rule Civ. Pro. Rule 15(a)(1)(B) in light of Defendants moving to dismiss The Regents state-court complaint pursuant to Fed. Rule Civ. Pro. 12(b)(6) ("A party may amend its pleading once as a matter of course within … 21 days after service of a motion under Rule 12(b)….").

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

**GENERAL ALLEGATIONS**

**The Regents and the ADCS**

6.      The Regents is a California corporation authorized and empowered to administer a public trust known as the University of California ("UC" or "the University").  Under Article IX, section 9, of the California Constitution, The Regents is vested with full powers of organization and government over the University, including all powers necessary or convenient for the effective administration of the public trust and the advancement of the tripartite mission of the University: to provide excellence in teaching, research, and public service.

7.      The Regents maintains a campus in this district known as the University of California, San Diego ("UCSD").  UCSD operates a School of Medicine as well as the UC San Diego Health System, which is the region's only academic health system and provides patient care, conducts medical research, and serves as a training ground for health care professionals.

8.      Since 1991, UCSD has managed a research enterprise known as the Alzheimer's Disease Cooperative Study ("ADCS") under a cooperative agreement with the National Institute on Aging ("NIA"), which is an agency of the federal government and one of the National Institutes of Health ("NIH").  The ADCS facilitates the testing of new drugs for the treatment of Alzheimer's disease, particularly drugs that might not otherwise be tested by private industry.  To this end, ADCS coordinates clinical trials and other research activities at approximately 70 academic medical centers and research clinics in the United States and Canada. The ADCS is in the nature of a joint venture, but instead of operating for profit, it operates for the advancement of the missions of the NIA and The Regents with respect to medical education, research, and public service.

9.      The work of the ADCS is funded primarily by the federal government and private companies pursuant to the terms of written contracts entered into by The Regents.  These contracts are sometimes colloquially referred to as "grants," and

typically carry titles such as "Collaborative Study Agreement" and "Clinical Trial Research Collaboration Agreement."  The value of the grant funding is in excess of $100 million.  This funding finances research activity as well as administrative costs, including the salaries of the approximately 80 employees and administrators who run the ADCS at UCSD.

10.    One of the core functions that UCSD performs in connection with the ADCS is to receive, monitor, and analyze clinical data ("ADCS Data") from research studies that ADCS administers.  Such clinical data includes medical information of the individuals who have volunteered to participate in clinical trials of new drugs, and other information of a sensitive nature.  Such data is transmitted to ADCS via the internet and stored on computer servers.  As used herein, the ADCS Data is distinct from the computer systems that UCSD built to collect, maintain, and process the ADCS Data.  Additionally, the software on which the UCSD computer systems run (which was also developed by UCSD's staff, while employed by UCSD), as used herein, is distinct from the computer system itself and from the ADCS Data; it is the taking of the ADCS Data and the actions taken by the Defendants to block access and restrict UCSD's ability to use its own computer systems that is a material issue in this case, as currently pled; it is not the misappropriation of UCSD trade secrets, or the infringement of UCSD's copyright in any source code or software.

**UCSD Entrusted Defendant Aisen with the Directorship of the ADCS**

11.    From the time that the ADCS was established in 1991 until February 2007, the Director of the ADCS was Leon Thal, M.D., a Distinguished Professor and Chair of Neurosciences at UCSD.  Dr. Thal had joined the UCSD faculty in 1985 and over the years became the acknowledged leader in the development of drug therapies for Alzheimer disease.  In February 2007, he was tragically killed in a plane crash.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-5-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

12.     Following the death of Dr. Thal, UCSD conducted a search for a new Director of the ADCS and hired Defendant Paul Aisen, M.D., in November 2007. Dr. Aisen became employed by The Regents as a Professor of Neurology and Medicine at UCSD and was appointed Director of the ADCS.  As such, Defendant Aisen was the agent of The Regents and its fiduciary in effectuating UCSD's participation in the ADCS venture.  In this director-level position, Defendant Aisen owed fiduciary duties to The Regents, including but not limited to, a duty of loyalty to the University during his tenure.  These duties included a duty to refrain from actions that are inimical to the interests of The Regents, and to avoid using his position as Director of the ADCS to give preference to his own interests, or those of a rival employer, at the expense of The Regents and UCSD.  The position of Director of the ADCS is one of prestige and influence in the field of life sciences, and UCSD placed trust and confidence in Defendant Aisen to discharge his obligations to The Regents with honesty and candor.

**Defendant Aisen and Defendant USC Conspire To Take All of the ADCS Employees and All of Its Contracts/Grants To Displace UCSD's Role in the ADCS**

13.     The Regents is informed and believe and therefore allege that as early as January 16, 2015, Defendant Aisen was in the process of putting to paper his plans to move the entire ADCS and all of its contract-based research grants to USC, and in doing so to disrupt UCSD's contractual relations with the private entities, as well as the National Institutes of Health/National Institute on Aging, that sponsor the various ADCS studies.

14.     Although the extent of Defendants' wrongdoing is still unknown, The Regents learned that, at least as early as April 2015, Defendant Aisen and Defendant USC began to conspire with one another to displace UCSD in the ADCS, to interfere with The Regents' contractual and economic relationships with ADCS funders, to interfere with The Regents' relationships with UCSD employees engaged in work on behalf of the ADCS, and to usurp the beneficial opportunities available

CROWELL & MORING LLP
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

to The Regents through UCSD's role in the ADCS.  The Regents do not presently have access to all of the facts showing the extent of the conspiracy and the wrongful acts done in furtherance of their common design, and though UCSD's motion for expedited discovery was granted and certain depositions were taken, additional discovery will likely yield yet more facts that bolster the claims that The Regents will present at trial.

15.     In or about April 2015, Defendant Aisen reached out to USC Provost Michael Quick to resume discussions, begun at some earlier time, regarding the potential for Defendant Aisen to join the faculty at USC, which operates the Keck School of Medicine ("Keck") near downtown Los Angeles.  Keck has an Alzheimer's Disease Research Center, also located near downtown Los Angeles.

16.     For reasons known best to Defendants, the discussions between Defendants Aisen and USC soon centered on making arrangements for Dr. Aisen to remain in the vicinity of La Jolla, where USC had no facilities of any kind. Defendants agreed to create a brand new "Institute" in San Diego by hiring away a number of key UCSD employees who then served the ADCS, and Defendants jointly planned to supplant UCSD as the contracting party in connection with research contracts and other agreements related to ADCS, including the lease for the office space that houses the UCSD/ADCS staff.  Defendants Aisen and USC thus planned to cripple UCSD's ability to perform its cooperative agreement with the NIA to administer the ADCS.

17.     Defendant Aisen demanded, and Defendant USC agreed to provide, significant incentives for Dr. Aisen to betray the trust reposed in him by UCSD. Among other things, USC in or about May 2015, offered Aisen a guaranteed salary of $500,000 per year through 2020, and both interest-free and low-interest financing on a new home, with forgiveness of at least half the debt over time.  The terms offered by USC were expressly set forth with the expectation that Aisen's salary would be paid by "extramural research funding you [*i.e.,* Aisen] obtain."  Thus,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-7-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

thanks to Defendant USC, Defendant Aisen has a strong personal financial incentive to interfere with The Regents' contractual relationships with UCSD's research sponsors.

18.     Defendant Aisen's compensation structure with USC was based in large part on Defendant Aisen's ability to transfer federal funding from UCSD to USC.  As of May 19, 2015, emails recovered in this case indicate that Defendant Aisen was finalizing salary negotiations with USC, with a May 19, 2015, email from Defendant USC's Associate Dean for Clinical Research, Thomas Buchanan, advising Defendant Aisen: "Here is an *updated* draft of the [USC Offer Letter].  All changes are in Appendix B."  (Italics added).  Defendant Aisen then circulated the revised draft to two of his co-conspirators, Defendants Tobias and Pizzola.  A true and correct copy of this email is attached to this FAC as Exhibit 1.

19.     Then, in an offer letter Defendant USC provided to Defendant Aisen, bearing a date of May 28, 2015, Defendant USC explained to Defendant Aisen the following:

> You are expected to charge research expenses and salaries against extramural research funding you obtain, as appropriate and as soon as that funding is obtained. **We expect that you will support your *entire salary* using funds from your institute.  You are expected to strive to transfer all current federal funding that may be transferred to USC as soon as possible**, but no later than 6 months after your start date, unless there are circumstances beyond your control.

*See* Draft of USC Offer Letter to Defendant Aisen, attached hereto as Exhibit 2, at p. 3 of 12 (emphasis added).  Through mechanisms including what is known as "indirect cost" recovery, the federal funding would provide Defendant USC with the benefit of covering its costs for the San Diego facility that was being created through the former ADCS personnel and its contracts and grants.  *Id*. at Appendix B at 1.

20.    Defendants further agreed that USC would provide a "start-up loan" of up to $8 million to finance the creation of the new "Institute" in San Diego. *Id.* In making these financial arrangements, Defendant USC expressly stated its expectation that Defendant Aisen would arrange a "transition to USC" of existing research activities administered by UCSD, and that the new "Institute" would incur real estate remodeling expenses only "if a relocation from current [UCSD-leased] facilities is required." *Id.; see also* p. 12 of 12 of Exhibit 1 at Appendix B.  Thus, thanks again to Defendant USC, Defendant Aisen had a strong financial incentive to interfere with The Regents' relationships with the UCSD faculty and employees who staffed the ADCS.

21.    The terms of Defendant USC's May 2015, offer to Defendant Aisen called for Aisen to join USC as of September 1, 2015.  In accordance with the incentives he anticipated to receive from USC, Dr. Aisen, while still employed by The Regents, and in violation of his duties of loyalty and fidelity, began to recruit other UCSD employees to join him in his scheme to interfere with the contractual relationships between UCSD and research sponsors, and to attempt to interfere with UCSD's performance of its agreements both with the NIA and with private sponsors of the ADCS.

22.    In or about April 2015, UCSD employees also began observing events that appeared out of place.  For example, one ADCS employee (who was one of the many to resign without advance notice and immediately assume the same position at USC) told another employee (who would later refuse to resign her employment with UCSD) that "there's something going on here.  Debbie Tobias asked me to make copies of every single job description, resume, and salary of every ADCS employee."  The employees surmised that there might be a layoff and became nervous but complied with the request by Defendant Tobias, who was the then Director of Administration for the ADCS.  At or about the same time, Defendants Tobias and Pizzola reserved ADCS conference rooms and held "closed-door"

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

meetings (held at UCSD's leased offices no less) with two to three unknown people (one man and possibly two women who were dressed up in business attire). These meetings lasted for about a day to a day and a half, and it was observed that Defendant Aisen would come in and out of the meetings, but at all times the doors would remain closed. UCSD is now informed and believes, and thereon alleges, that those meetings were taking place among Defendants Aisen, Tobias, Pizzola, and representatives of USC for the purpose of furthering the conspiracy to take from UCSD the ADCS Data as well as to encourage the ADCS employees to resign from UCSD and join USC.

23. At or about this same time, and also while still employed at The Regents, Defendant Aisen used his position as Director of the ADCS to transition federal funding away from UCSD and towards his prospective employer, USC. For example, Defendant Aisen contacted several NIA representatives on May 21, 2015, to notify them of his impending move to USC and that he expected to "complete the transition to a USC affiliation September 1, 2015." A true and correct copy of this email communication is attached to this FAC as Exhibit 3.

24. Handwritten notes recently found in Defendant Aisen's office indicate that Defendant Aisen and USC expected the actions of Defendant Aisen and his co-conspirators to raise a significant number of legal issues arising from the scheme they were in the process of carrying out, such that Defendant Aisen noted that he and his co-conspirators would need an "aggressive litigator."

**The May 22, 2015 Announcement by Defendant Aisen to the ADCS Staff that He and the Entire ADCS Were Leaving to USC Including All Contracts and Grants**

25. On May 22, 2015, after entering into the conspiracy with USC, Defendant Aisen, using the authority of his position as director of the ADCS, summoned all ADCS employees to a meeting at the Sheraton hotel across the street from the ADCS and told them that he was moving to USC, and that all the ADCS grants and sponsors would move with him.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

-10-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

26.     Aisen also falsely advised the meeting attendees that none of the employees working on behalf of ADCS would have jobs at UCSD.  Aisen told the ADCS staff that USC would offer all of them jobs if they left UCSD.  After Defendant Aisen finished speaking to the ADCS staff, Defendant Tobias stood up and took the microphone.  Tobias then said that she had looked at the USC proposal and it was a good deal, and that USC would extend offers to all employees at the same or greater salary than they currently were being paid by UCSD.  Tobias further clarified that USC's Human Resources Department would be on-site the following Wednesday, May 27, 2015, and that USC had been given copies of all ADCS job descriptions, all resumes of the employees, and the salaries of all ADCS employees, and that USC would "use this information" to prepare job offers for each of the ADCS employees.  Tobias further said that the "transition" would be completed by September 1, 2015, and the ADCS would likely be moving from the existing space as the ADCS' lease was up.  Tobias then stated that everyone working within the ADCS would receive offer letters by mid-July 2015.  So there is no doubt, attached as Exhibit 4 to this FAC is a true and correct copy of a table listing the meetings that Defendants had planned out for USC to meet with the ADCS staff the next Wednesday, May 27, 2015.  That document, titled "USC HR Group Meetings Schedule Wed May 27th," lists by ADCS group the meetings USC was planning to have with the ADCS employees to set in place their job offers with USC and, in turns, their resignations *en masse* from UCSD.  The brazenness of the actions of Defendants Aisen, Tobias, and Pizzola, as Exhibit 4 shows, is demonstrated by the fact that they and *USC planned to conduct the USC HR meetings within the very same complex being occupied by the ADCS.  See* column titled "Location," which lists various conference rooms each of which are within the complex being *leased by UCSD* to house *its* ADCS.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-11-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

27.     At that May 22, 2015, meeting at the Sheraton Hotel, Defendant Pizzola also took the microphone encouraging all ADCS personnel to join him, and the other Defendants, in moving to USC.

28.     After the May 22, 2015, meeting, Defendant Harless, while still employed by UCSD, distributed "job numbers" to individual UCSD employees indicating the open position at USC to which the individual UCSD employees should apply.

29.     The definitiveness and certainty of Defendant Aisen's comments at the May 22 ADCS staff meeting about his commitment to move to USC and take all the ADCS studies with him, is also confirmed by the May 21, 2015, email Defendant Aisen wrote to the NIH wherein he said: "**Our** *decision to* ***accept*** the USC offer was therefore straight-forward." *See* Exhibit 3 at p. 4 attached (emphasis added). Defendant Aisen's use of the word "Our" in terms of the decision that had been made to move to Defendant USC is further evidence of Defendant Aisen working together with his co-conspirators to take the actions that are set forth in this FAC.

**Defendant USC Holds Job Fair to Encourage All ADCS Staff to Leave UCSD**

30.     In or about the first week of June 2015, Defendant USC held what some have referred to as a "job fair" exclusively for the purpose of transitioning ADCS employees to USC.  Defendant USC had originally planned on holding the job fair on May 27th.  *See* Exhibit 4.  Defendant USC acted with indifference to the rights and obligations of the ADCS to UCSD by conducting the job fair at the Sheraton Hotel, across the street from the ADCS offices.  Defendant Tobias and Pizzola fueled the distress caused by Defendant Aisen's announcement on May 22, 2015, that he and all of the studies would be leaving UCSD for ADCS.  They did this by spreading rumors that the ADCS was about to be shut down.  People who ended up staying at UCSD described the fear this caused, saying that this created a feeling that "we have to go [to USC] or else we won't have jobs."

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-12-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

31.     Almost all of the ADCS employees attended the job fair at the Sheraton Hotel. Defendant Jimenez-Maggiora had told people within the ADCS to ensure that they dressed up and to look their best.  Thus, many of the ADCS employees were seen wearing interview attire. This created a feeling described by some within the ADCS as being "surreal."

32.     At the Sheraton Hotel, Defendant USC held the meetings in one large room.  According to people that attended, there were multiple tables (about 4-5) with a representative from USC at each.  Once a table opened up, an ADCS employee waiting to meet with Defendant USC would go to the table.  The representative from Defendant USC asked for the person's name, and after looking up information (which some people say the USC representatives had on tablet computers), the USC representative provided a USC job title, and also handed out a document with a job description/job duties, together with a salary range for various positions.  Many of these job descriptions and proposed job duty descriptions were described as "generic."  For example, when one ADCS employee-interviewee pointed out to the USC representative that what she had been given did not match the duties she actually performed for the ADCS, and that the salary was also substantially off compared to what she was making at UCSD, the USC representative responded, "don't worry about it, we just need to get you in the system."  As to the salary, the USC representative said, "we'll fix that later once you get started."  Representatives of Defendant USC were also heard saying, "we have a job for everyone at the ADCS," and that the ADCS employees must apply right away as "we [USC] need to get these positions filled immediately."

33.     Significantly, Defendant Tobias and Pizzola were also present at the USC job fair, where they acted as liaisons for USC, and helped USC hire away UCSD employees.  This is true despite the fact that they were UCSD employees and being paid a salary by UCSD.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-13-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

34.     After the USC job fair, some ADCS employees heard their then co-workers refer to people who were expressing loyalty to UCSD as "traitors." Defendant Pizzola told people who were considering staying at UCSD, "everyone is going; there is nothing going to be left here."  He then said, "why would you stay here," referring to ADCS employees thinking of staying at UCSD and not leaving for USC.

35.     The conduct by Defendants Aisen, Tobias and Pizzola referenced in Paragraphs 25 to 33 created fear and unrest and concern among UCSD's employees and disrupted their relationships with The Regents.

36.     Each of Defendants Jeremy Pizzola, Deborah Tobias, Gustavo Jimenez-Maggiora, Phuoc Hong, Hong Mei Qiu, Stefania Bruschi, Jia-Sing So, Mayya Nessirio, Elizabeth Shaffer, Devon Gessert, and Kelly Harless, were UCSD employees who agreed to join Defendant Aisen in a conspiracy to act as "double agents" — ostensibly employed by The Regents but in reality working to undermine UCSD, to advance their own personal interests, and to serve the interests of Defendant USC, in violation of their obligations under California Labor Code 2863, which states "An employee who has any business to transact on his own account, similar to that entrusted to him by his employer, shall always give the preference to the business of the employer."  For example, approximately one week prior to the May 22, 2015 staff meeting, above, and while still employed by The Regents, with the knowledge of Defendant Aisen, Defendant Tobias arranged a meeting with USC personnel and personnel at UCSD to facilitate USC's understanding of the ADCS physical server organization, connections, and structures.  Several people from Defendant USC visited the ADCS offices and took notes and pictures of the servers used to store documents in a system known as "CTMS" (the Clinical Trial Management System) which, in turn, were used by many ADCS employees. Approximately one week after the May 22, 2015, meeting, Defendants Tobias and Pizzola also requested and received copies of all CTMS data stored on the CTMS

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1   local servers prior to their departure.  Further discovery from the Defendants will be

2   required to determine exactly what was taken from the CTMS local servers.

3   **Defendants Encouraged Study Sponsors to Terminate their Contracts with
    UCSD**

4

5        37.    In addition to encouraging the NIA to move its sponsorship to USC, as

6   alleged above in paragraph 23, Defendants Aisen, Pizzola, and Tobias, while still

7   employed by The Regents, contacted a number of the more important commercial

8   sponsors of ADCS research, without informing UCSD that they were doing so, in an

9   effort to persuade the sponsors to terminate, and move, their contracts with UCSD to

10  USC.  For example, Defendants Aisen, Pizzola, and Tobias attempted to pressure

11  and persuade Toyama Chemical Company ("Toyama"), a research sponsor and party

12  to a Collaborative Study with The Regents, to terminate its contractual arrangement

13  with The Regents and form a new contract with USC.  On May 30, 2015, Defendant

14  Pizzola wrote to Toyama:

15          We believe that Paul [i.e., Defendant Paul Aisen] can
            affiliate with USC and form a new institution that would
16          reside here in San Diego.  The new institute will hire on
            all of the staff members currently working for Paul.  We
17          have discussed with USC and they have indicated that
            they can issue replacement contracts to all TCAD sites
18          [i.e., research facilities under contract with The Regents]
            simultaneously with precisely the same terms and
19          conditions. . . . This would need to be very carefully
            timed with Toyama as we believe Toyama could chose
20          [sic] to cancel its agreement with UCSD with 30 days'
            notice.
21
            In short we believe that we can have essentially the same
22          people filling the same roles in the TCAD study simply
            under a new institutional affiliation.
23

24       38.    Toyama's representatives responded to Defendants Aisen, Pizzola, and

25  Tobias on June 3, 2015, stating in part, "Have you already discussed these with

26  UCSD and NIH?  It is important for Toyama to confer directly with UCSD to make

27  sure that Toyama honors all of its obligations to UCSD and complies with all

28  applicable laws."  However, rather than advise UCSD of Toyama's inquiry,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-15-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

1   Defendant Pizzola replied "we do not think it is time to discuss anything with

2   UCSD," and told Toyama "we don't know what's going to happen with UCSD."

3        39.    On June 8, 2015, Toyama wrote directly to Defendant Aisen, stating in

4   part:

5            After carefully considering the actions that Jeremy [*i.e.,*
             Defendant Pizzola] and you have recently requested of us,
6            we find that the complexity of these requested actions
             raises a series of significant logistical, contractual, and
7            regulatory compliance issues.  Resolution of these issues,
             from both business and legal perspectives, requires us to
8            consult with UCSD and its counsel.  We thus request that,
             in addition to the project meeting scheduled for next week
9            in San Diego, that you kindly arrange for us and our
             counsel to meet separately with the appropriate
10           representatives of UCSD and its counsel so that this
             consultation can occur.
11

12  Notwithstanding this explicit request from Toyama, Defendant Aisen concealed the

13  communication from UCSD and its counsel, and accelerated Defendants' planned

14  transition to USC.

15       40.    Earlier, Defendant Aisen was observed engaging in very similar

16  conduct, telling a researcher at Yale University (who was responsible for the study

17  known as FYN) that, "by the way, I'm resigning.  I've been trying to work things

18  out with UCSD, but it has not been working.  I am going to USC."

19  **Defendants' Additional Bad Acts Against UCSD Done While Still Employed**
    **And Receiving A Salary From UCSD**
20

21       41.    Additional wrongful acts of the Defendants also include as follows:

22  Devon Gessert, the then Director of Clinical Operations for the ADCS, and

23  Defendant Kelly Harless, the Clinical Operations Manager for the ADCS, told

24  ADCS employees: "We need to immediately ship out all the clinical trial supply

25  kits," and instructed other ADCS employees to download onto USB sticks or

26  external drives their respective emails.

27       42.    Then, Defendant Elizabeth Shaffer, the Regulatory Director of the

28  ADCS who later moved to USC, told another ADCS employee that she had been

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-16-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

directed by Defendant Pizzola to take and then to ship FDA forms, known as "1572 forms," and was doing so with respect to two studies.  In this regard, one employee of the ADCS saw Defendant Shaffer walking out of the ADCS offices with the "1572 forms" for one of the two studies referenced above.  Defendant Shaffer was also observed shipping out months-worth of clinical trial supplies.  Defendant Shaffer was observed doing all of these things while she was still employed, and being paid by, UCSD.  One employee, who remains employed by UCSD, confronted Shaffer and said to Shaffer, "you don't own these documents, and I can't believe you are doing this."  Shaffer responded, "I created them, so I can remove them."  It was also observed that other forms and miscellaneous documents were being taken by the employees who would later quit their employment with the ADCS in favor of USC. They did this despite UCSD's obligation, as the coordinating center for these and other studies, to keep and maintain these forms in its files.

43.     Separately, UCSD learned from employees who did not leave to join USC that prior to the Defendants resigning their employment to join USC, there was an approximately three-hour meeting between Eli Lilly representatives and several of the defendants while they (these defendants) were still employed by UCSD. UCSD is informed and believes and thereon alleges that at that meeting was Defendant Gessert, who as noted above, later quit and joined USC, as well as Alison Belsha, the then Project Manager on the Eli Lilly "A4" study, who also resigned and then joined USC, as well as certain unidentified Lilly personnel.  UCSD is also informed and believes and therefore alleges that Belsha told another UCSD employee that she had just got off the phone with representatives of Eli Lilly for what was described as a "transition planning meeting" and wherein it was discussed that Eli Lilly had been persuaded to take its A4 study away from UCSD, so that Defendants Aisen and USC could administer it.  Significantly, this meeting occurred weeks before Defendant Aisen resigned.

CROWELL & MORING LLP
ATTORNEYS AT LAW

-17-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

44.     Further, during the second to last week of June, while still employed by UCSD, Defendant Shaffer  took part in a meeting with someone she described as the Chair of the USC Institutional Review Board ("IRB"),  for the purpose of preparing paperwork to submit to what she described as a July 12th IRB meeting at USC. Defendant Shaffer told another ADCS employee that USC wanted its IRB to approve of USC taking over the Eli Lilly A4 study as soon as possible, to facilitate written agreements between Eli Lilly and USC for transfer of Eli Lilly's grant for the "A4 Study" from UCSD to USC.  Further, Defendant Shaffer told ADCS personnel that she was in the process of working with USC to prepare "protocols" to be presented or approved by the USC IRB during its July 12th meeting, and for the purpose of moving the studies known as "FYN" and "INI."  The INI study is sponsored by Wake Forest University.  Again, Defendant Shaffer engaged in all of these efforts in derogation of UCSD's interests while still employed by UCSD. Moreover, Defendant Shaffer explained that she felt that she was not violating any laws or obligations to UCSD as she was not doing this work while physically at the ADCS offices, but rather doing it from an undisclosed remote location.

45.     Additionally, UCSD is also informed and believes and thereon alleges that Defendant Harless promised, in emails and/or text messages she sent to certain ADCS employees, that everyone would be getting USC offer letters; provided details of the USC "job fair" alleged above; and told them what USC jobs they should be applying for (which would mirror their then-current jobs at the ADCS). Defendants Gessert and Harless acted as intermediaries between Defendants Pizzola and Tobias who were more focused on high-level administrative tasks as it related to attempting to move the entire ADCS to USC.

46.     Still further, during the chaos that Defendants had created within the ADCS, Defendant Pizzola, along with Defendants Aisen and Tobias, encouraged ADCS employees to leave UCSD and take jobs with USC.  For example, Defendant Pizzola told one of the Clinical Monitors (a key person who enables the ADCS to

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-18-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

carry out its patient-monitoring duties for the various studies) during the approximately one to two weeks before June 21, 2015, that she should apply for a job at USC and that "all studies would be moving to USC." When this individual had not applied for a job, Defendant Pizzola followed up asking, "why haven't you applied yet?" referring to a job that was waiting for her at USC. Again, Defendant Pizzola made these statements, like the multiple other wrongful acts of the Individual Defendants, while still employed at and being paid by UCSD.

**UCSD's Request that Defendant Aisen Avoid Violating the Law as He Is Departing Results in Defendant Aisen's Immediate Resignation**

47. Then, on or about June 18, 2015, while travelling and away from San Diego, Dr. Aisen sent an email announcing that he would be resigning from UCSD effective July 1, 2015, to take a position at USC. That same day, UCSD Campus Counsel Dan Park sent Aisen a letter congratulating Aisen on his job offer from USC, and reminding Aisen of his fiduciary duties as Director of the ADCS, and an employee's duty of undivided loyalty to his employer during the term of employment. Mr. Park's letter further explained:

> In addition to avoiding any action that could disrupt UC San Diego's contractual relationships, you should be sure not to remove from UC San Diego's possession or control any equipment, records, electronic data, or software that were purchased or created for the ADCS at UC San Diego. All such items are the property of UC San Diego, the taking of which without UC San Diego's express permission would be an illegal conversion. *Burlesci v. Petersen* (1998) 68 Cal.App.4th 1062. Conversion is a strict liability tort, "meaning questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial." *Id.* Similarly, you should not attempt to delete or destroy any records or documents, whether electronic or physical.

> In summary, UC San Diego will be pleased to provide you with assistance as you make your transition to your new position. At the same time, UC San Diego hopes that you will provide similar assistance to ensure the continued smooth functioning of the ADCS at UC San Diego as we prepare to search for a new director.

48.     After receiving UCSD counsel Park's June 18th letter requesting compliance with his legal obligations and cooperation in transition, Defendant Aisen chose a diametrically opposite course.  Without having returned from his travels, on Sunday, July 21, 2015, Aisen sent an email stating, "Because of the tone and implications of the letter I received on 6/18/15 from UCSD general counsel, as well as threatening statements made by UCSD leadership, it is untenable for me to remain at UCSD through my planned resignation date.  I resign immediately, effective today, 6/21/15."

49.     On or about 12:04 a.m. on Sunday June 21, 2015, USC's Associate Dean for Clinical Research, Thomas Buchanan, emailed Defendant Aisen regarding UCSD's electronic data capture ("EDC") system.  Although Buchanan had exchanged many emails with Aisen during the negotiations over the "transition" of the ADCS from UCSD to USC, Buchanan's email was written as if it were the first, starting, "I got your email address from Helen Chui, who told me about the electronic data capture system that is in use at the Alzheimer's Disease Cooperative Study. . . ."  Buchanan asked Defendant Aisen "to request the software for USC."  A true and correct copy of this email is attached to this FAC as Exhibit 5.  USC's Buchanan wrote:  "I am writing to request the software for USC, where we would like to use it for clinical trials conducted by our faculty members.  Please let me know what we need to do to obtain the software." Given that Aisen had accepted employment at USC in May, 2015, both Buchanan and Aisen were aware that Aisen was under a conflict of interest with respect to Buchanan's request for UCSD software. Nevertheless, Aisen promptly forwarded Buchanan's message (at 4:19 a.m.) to Defendant Pizzola, stating "I am forwarding this request to you as senior administrative officer at the ADCS. Please respond direct to Drs. Buchanan and Chui."  Given that Pizzola had also committed to leave UCSD for USC, both Aisen and Pizzola were aware that they were both under a conflict of interest with respect to the transfer of UCSD property to USC.  Plaintiff alleges these facts in support of

CROWELL & MORING LLP ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

its claims that Defendants breached their state law duties to UCSD, and proceeded with guilty knowledge.

50. After tendering his resignation, Defendant Aisen refused to consent to an exit interview with any of his former colleagues at UCSD, and made no arrangements for the transition of his responsibilities as Director of the ADCS, despite multiple requests from UCSD.

51. Defendant Aisen and other Individual Defendants arranged for the return of the laptop computers that had been issued to them and which were owned by The Regents. Almost all UCSD laptops used by Individual Defendants had been wiped of all data, notwithstanding The Regents' ownership of the data.

52. Worse, upon their departure, and through the present, Defendant Aisen and the Individual Defendants have exerted dominion and control over the ADCS Data that has been entrusted to UCSD as a participant in the ADCS, and have failed and refused to provide UCSD with account data, passwords, and access credentials to enable UCSD to maintain administrative control of ADCS Data, as set forth below.

**Defendants Take Control over ADCS Data after Resigning from The Regents**

53. One of the core functions that UCSD performs in connection with the ADCS is to receive, monitor, and analyze data from clinical trials and research studies that ADCS administers. Such clinical data include medical records of the individuals who have volunteered to participate in clinical trials of new drugs, and other information of a sensitive, confidential, and proprietary nature. Such data are typically transmitted to ADCS from the various sites at which clinical studies are conducted via an internet website with a unique URL and stored on computer servers. UCSD sometimes contracts with commercial vendors such as Amazon to host ADCS Data on their computer servers, colloquially referred to as "the Cloud."

54. Maintenance of data pertaining to clinical trials is subject to detailed regulations promulgated by the federal Food and Drug Administration (FDA).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-21-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

Maintenance of study data is also subject to contractual obligations set forth in the contracts between The Regents and the companies and government agencies that sponsor clinical trials.  Such contracts specify that all data created or captured by UCSD related to the ADCS program will be jointly owned by The Regents and the sponsors, and will be maintained by UCSD.

55.    For example, The Regents entered written agreements with Eli Lilly and Company ("Lilly"), and the Toyama Chemical Company ("Toyama") with respect to research studies that were ongoing at the time of Defendant Aisen's resignation, and remain ongoing today.  A true and correct copy, without exhibits, of The Regents' agreement with Lilly is attached hereto as Exhibit 6 (the "Lilly Agreement").  A true and correct copy, without exhibits, of The Regents' agreement with Toyama is attached hereto as Exhibit 7 (the "Toyama Agreement").

56.    None of the Defendants are parties to the Lilly Agreement or the Toyama Agreement.

57.    Pursuant to Section 18.1 of the Lilly Agreement, UCSD is required to create and maintain all records required by the Agreement, and Section 16.1 provides that Study Data will be captured by UCSD and maintained jointly by Lilly and UCSD.  *See* Exhibit 6.  Pursuant to Section 16.2, the study data are jointly owned by Lilly and UCSD.

58.    Pursuant to Section 8(C)(i) of the Toyama Agreement, Clinical Study results shall be jointly owned by Toyama (and its parent company) and The Regents. *See* Exhibit 7.  Pursuant to Section 8(C)(iii), all joint intellectual property created as a result of the clinical studies will belong jointly to Toyama (and its parent company) and The Regents.  *Id.*

59.    The ADCS was also partially funded by an award from Department of Health and Human Services, through the NIH.  The terms of this funding are set forth in the Notice of Award ("NOA") issued by NIH on December 8, 2014.  A true and correct copy, without exhibits, of the NOA is attached hereto as Exhibit 8.  (The

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-22-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

financial information on this copy was redacted by the University's Department of Contracts and Grants in connection with making the NOA publicly available.) Pursuant to the NOA, UCSD is expressly identified as the grant recipient, and funding provided by the NIH is to be received by Defendant Aisen "on behalf of [UCSD]." *See* Exhibit 8 at p. 1; *see also* p. 3 of December 12, 2014 letter from Alzheimer's Association attached as part of Exhibit 8.  Further, the NOA expressly provides that a principal investigator such as Defendant Aisen may not transfer the ADCS project to another host institution without first securing approval from the NIH and a written release by UCSD approving the transfer.  Exhibit 8 at "Conditions of Award" at p. 9.  Representatives of NIH have confirmed, following Dr. Aisen's resignation, that "UCSD is the grant holder and retains custody of the data."

60.  In short, the contracts governing the ADCS make it abundantly clear that the data generated by ADCS studies are to be maintained under the control of UCSD for the benefit of the study sponsors and The Regents, who are the owners of the data.  There is no plausible interpretation of the governing contracts that would accord Defendant Aisen or any of the Individual Defendants the right, privilege, or power to assume control of ADCS Data after severing their employment from UCSD, but this is exactly what Defendants have done.

61.  While still employed by UCSD, Defendant Aisen and one or more of the Individual Defendants, conspired to arrange for ADCS Data to be hosted on an Amazon account in the name of a party other than UCSD, presumably one or more of the Individual Defendants, or persons under their control.  The account bears Amazon Account No. 675713428646.  According to UCSD accounting records, Amazon had invoiced UCSD, and The Regents has paid, approximately $96,000 for the maintenance of this account.

62.  After the resignations of Defendant Aisen and the other Individual Defendants, representatives of UCSD made repeated requests that the Defendants

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

turn over to UCSD all account data, passwords, and access credentials for any and all repositories holding ADCS Data, including Amazon Account No. 675713428646.  The Defendants failed to respond in any meaningful way, and have failed and refused to relinquish control of ADCS Data.

63.     On Sunday, June 28, 2015, UCSD Dean and Associate Vice Chancellor Gary S. Firestein, M.D., sent an urgent message to his counterpart at USC, Associate Dean for Clinical Research Thomas Buchanan, stating, "Since Dr. Aisen is now an employee and agent of USC, we formally request your assistance in directing Dr. Aisen to turn over to UCSD all account data, passwords, and access credentials for any and all repositories holding ADCS data, of whatever kind or nature."  Dr. Firestein's message was referred to USC Provost Michael Quick for response.  Mr. Quick responded on Monday, June 29, 2015, "I will assume that this issue of access to data, etc., will get resolved today," but took no steps to do so, and the Defendants continue to assert dominion and control over ADCS Data.

64.     While the EDC system was originally hosted solely on physical servers at UCSD at The San Diego Supercomputer Center (SDSC), the system was placed on the Amazon "cloud" under a UCSD account.  Amazon invoices show that Defendant Aisen changed the billing address for the Amazon cloud account (hosting the ADCS Data) from UCSD to Defendant Aisen's *home address*.  *Compare* April 1, 2015-April 30, 2015 AWS invoice, *with* AWS invoice for the period of May 1, 2015, to May 31, 2015; attached to this FAC as Exhibit 9.  UCSD also has discovered that Defendants diverted and blocked UCSD's access to at least one other account in the "cloud," on a source code hosting website called GitHub. Recent discovery further reveals that Defendants Jimenez-Maggiora, and Hong, were directed by, and acted together in a conspiracy with, Defendant Aisen to accomplish this, and did this while all of them were employed by UCSD, and being paid as employees of UCSD.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

-24-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

65.     The Defendants' exercise of dominion and control over ADCS Data, including Amazon Account No. 675713428646, has harmed The Regents and the ADCS in the following ways:

   a.   Security patches and other maintenance operations such as software upgrades cannot be conducted.

   b.   System monitoring is not possible, increasing the risk of hacker attacks and data breaches.

   c.   Management of user accounts including the creation of new accounts, updating permissions for existing accounts and removal of deprecated accounts is not possible, leading to potential security vulnerabilities.

   d.   Randomization codes may not be accessible, and safety monitoring can be compromised.

   e.   Access to the backend database is not possible, thus restricting reports to those that can be obtained through the existing web-based system.

   f.   The code base cannot be inspected for potential security vulnerabilities including potential backdoors into the system.

   g.   The type or amount of services procured from Amazon cannot be controlled, leading to potential abuse of account billing.

   h.   All data are at risk for irreversible manipulation, duplication and/or deletion and the creation of local snapshots for data backup/history is not possible.

66.     As a result of the conduct alleged herein, The Regents has suffered damages, and will continue to incur damages, in an amount to be proved at trial.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-25-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

**Defendants Committed Other Misconduct, Including Efforts to Conceal Evidence of Their Wrongdoing, and To Hamper UCSD's Efforts to Recover Valuable Information Necessary to Resume Operation of the ADCS**

67.  Not only did Defendant Aisen and his other co-conspirators engage in the aforementioned bad acts, but they then took further actions to harm UCSD, and hamper UCSD's ability to take over the ADCS after their resignations *en masse*. Specifically, the other bad acts taken by Defendants include, but are not limited to:

a.  Defendant Jimenez-Maggiora purchased an external hard drive in or about the 2nd quarter of 2015 and copied the contents of his entire UCSD laptop onto it.  Defendant Jimenez-Maggiora has admitted under oath that he failed to ask anyone's permission at UCSD before making a copy of the entire contents of his UCSD laptop, including UCSD email and passwords, before making a copy of the UCSD laptop onto his hard drive which he now has in his possession.

b.  Defendant Jimenez-Maggiora never told anyone at UCSD that he had taken and retained a snapshot of his UCSD computer.

c.  Defendant Jimenez-Maggiora originally testified under oath in this case that although USC bought him a laptop to use for the benefit of USC, he did not copy or transfer any information from the external hard drive (containing the entire image of his UCSD laptop) to his USC laptop.  However, when Defendant Jimenez-Maggiora saw an email sent by him from his UCSD email address, and dated June 3, 2015 (weeks prior to his June 26, 2015, resignation from UCSD), sent by USC employee Rene Pak regarding Defendant USC establishing an enterprise agreement with AWS, Jimenez-Maggiora then admitted that he had actually had a copy of that email on his USC-provided laptop computer.

FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF CASE NO. 3:15-cv-01766-BEN-BLM

CROWELL & MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

d.    Before resigning from UCSD, Defendant Tobias copied UCSD data (The Regents does not currently know exactly what she copied as Defendant Tobias is in sole possession of such data) to USB Storage Devices.  Specifically, forensic investigation has revealed a number of link files on the computer indicating the transfer of data from the computer to a USB storage device, such as a thumb drive or an external hard drive.  UCSD is informed and believes and thereon alleges that Link files are similar to shortcuts in that they reference a file in another location.  These link files have timestamps for themselves along with the file that they reference.  A number of the link files indicated that files were copied from this computer to a Kingston DataTraveler 2.0 USB device, some of which were copied into a file folder titled "\USC\."  Several of the link files pointing to that thumb drive, including those in the USC file folder, reference the ADCS:

F:\USC\ADCS Support.V2.dct.xlsx

F:\USC\ADCS to USC PSNL.dct.xlsx

F:\USC-ADCS Press Release.docx

F:\USC\HR Meeting Schedule.xlsx

e.    UCSD is informed and believes and thereon alleges that all of these files have a timestamp of May 22, 2015, well before she was to resign from UCSD in favor of USC.

f.    Defendant Aisen was in possession of three computers and one smart phone, one of which is a laptop UCSD provided at its expense to enable Defendant Aisen to conduct UCSD business, but which Defendant Aisen to this date has refused to return (claiming it has personal information on it).  Defendant Aisen also refuses to return the smart phone UCSD provided to him at

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-27-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

its expense for his use as a UCSD employee.  Additionally, UCSD is informed and believes and thereon alleges that Defendant Aisen, either personally or through his co-conspirators, deleted archived PST files, as well as files that were once contained in a "DropBox" folder (as well as numerous subdirectories).

g.     Defendant Jimenez-Maggiora admitted that after downloading the entirety of the UCSD laptop onto an external hard drive, he then "wiped" the UCSD laptop.  Further, prior to wiping his UCSD computer, Defendant Jimenez-Maggiora did not seek permission or authorization from UCSD to remove all such data (belonging to UCSD) by wiping that computer.

h.     Defendant Hong admitted that he reinstalled the operating system on his UCSD-provided Macbook laptop the day after he resigned from UCSD.  UCSD is informed and believes and thereon alleges that re-installation of an operating system on a computer has the potential to overwrite data on the computer, thereby permanently deleting it, and rendering the remainder of the data inaccessible without the use of specialized recovery tools.  It is considered to be a primary "anti-forensic technique" used to make it extremely difficult, if not impossible, to recover the data (and evidence of wrongdoing) that may once have resided on the machine.  According to Defendant Hong, under oath, all email, including his Gmail account, were wiped as part of the reinstalling of the operating systems on the UCSD-provided laptop.  Further, Defendant Hong admitted that he never told anybody at UCSD that he had wiped his Macbook or that he had wiped his hard drive.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-28-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

68.     Currently, The Regents does not know what other bad acts the other defendants not named in preceding paragraphs did in terms of efforts to harm UCSD, as those defendants exclusively possess the evidence/data which UCSD is informed and believes and thereon alleges would demonstrate their further wrongdoing.  UCSD reserves the right to amend these allegations after further discovery regarding the actions undertaken by Defendant Aisen, the Individual Defendants, and Defendant USC.

## FIRST CLAIM FOR RELIEF

### (BREACH OF FIDUCIARY DUTY - AGAINST DEFENDANT AISEN)

69.     The Regents incorporates herein, by way of reference, all other paragraphs set forth in this FAC in support of this claim for relief.

70.     By virtue of being entrusted to act as The Regents' agent in serving as Director of the ADCS, Defendant Aisen was a fiduciary to The Regents and owed fiduciary duties.

71.     Defendant Aisen breached his fiduciary duties by committing the acts complained of herein, namely committing numerous bad acts against the best interests of UCSD and the ADCS, all in an effort to benefit himself and his new employer, Defendant USC, while still employed and being paid by UCSD.

72.     As a direct and proximate result of Defendant Aisen's wrongful and tortious conduct, Defendant Aisen has been unjustly enriched at the expense of The Regents, and The Regents has suffered, and will continue to suffer, substantial damages including, but not limited to, the disruption and/or loss of contractual relations with ADCS sponsors and employees, costs incurred recovering data owned or controlled by The Regents, the loss of property owned by The Regents, and costs incurred with repairing and monitoring UCSD's network.  Defendant Aisen's actions were a substantial factor in causing The Regents' harm.

73.     This claim is not predicated on the theft of source code or other proprietary information or trade secrets owned by The Regents, or the infringement

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-29-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

of copyright in software source code that was developed and is owned by The Regents.

74.     The above-recited actions of Defendant Aisen were done with malice, fraud, oppression, and reckless disregard of the above described rights of The Regents and within the meaning of California Civil Code § 3294. Therefore, The Regents is entitled to recover punitive damages against Defendant Aisen.

## SECOND CLAIM FOR RELIEF

### (BREACH OF DUTY OF LOYALTY - AGAINST INDIVIDUAL DEFENDANTS AND DOES 1-20)

75.     The Regents incorporates herein, by way of reference, all other paragraphs set forth in this FAC in support of this claim for relief.

76.     By virtue of being employed by The Regents, each of the Individual Defendants owed a duty of loyalty to The Regents during the term of their employment.

77.     The Individual Defendants breached their duties by committing numerous bad acts which were against the best interests of UCSD and the ADCS, all in an effort to benefit themselves, and their new employer, Defendant USC, and Defendant Aisen, while still employed and being paid by UCSD.

78.     Defendants acted in violation of their common law duty of loyalty owed to The Regents and in violation of California Labor Code §§ 2861 and 2863. Labor Code § 2861 specifically states that "[a]n employee shall, on demand, render to his employer just accounts of all his transactions in the course of his service, as often as is reasonable, and shall, without demand, give prompt notice to his employer of everything which he receives for the account of the employer."  Labor Code § 2863 specifically states that "[a]n employee who has any business to transact on his own account, similar to that entrusted to him by his employer, shall always give the preference to the business of the employer."  While still employed by The Regents, the Individual Defendants violated Labor Code § 2863 and also transferred

CROWELL & MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

their loyalty to Defendant USC by working directly against the interests of UCSD, the ADCS and its mission, all for their own benefit and the benefit of their new employer, Defendant USC, and its new employee, Defendant Aisen.

79.     This claim is not predicated on the theft of source code or other proprietary information or trade secrets owned by The Regents, or the infringement of copyright in software source code that was developed and is owned by The Regents.

80.     As a direct and proximate result of Defendants' wrongful and tortious conduct, the Individual Defendants have been unjustly enriched at the expense of The Regents, and The Regents has suffered, and will continue to suffer, substantial damages including, but not limited to, costs incurred recovering data owned or controlled by The Regents, the loss of property owned by The Regents, and costs incurred with repairing and monitoring UCSD's network.  Defendants' actions were a substantial factor in causing The Regents' harm.

81.     The above-recited actions of the Individual Defendant were done with malice, fraud, oppression, and reckless disregard of the above described rights of The Regents and within the meaning of California Civil Code § 3294. Therefore, The Regents is entitled to recover punitive damages against the Individual Defendants.

## THIRD CLAIM FOR RELIEF

### (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY - AGAINST DEFENDANT USC, AND DOES 1-25)

82.     The Regents incorporates herein, by way of reference, all other paragraphs set forth in this FAC in support of this claim for relief.

83.     The acts described above (in support of The Regents' first and second claims for relief) constitute a breach of fiduciary duty owed by Defendant Aisen and breach of the duty of loyalty by the Individual Defendants.  Defendant USC is responsible for that harm in that Defendant USC aided and abetted Defendant Aisen

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-31-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

and the Individual Defendants in committing the breach of duty of loyalty and fiduciary duty.  Specifically, Defendant USC assisted Defendant Aisen and the Individual Defendants in formulating a plan to take all of the ADCS employees and move them to Defendant USC, *en masse*, using inside information wrongfully obtained by, among others, Defendants Tobias and Pizzola (and certain other ADCS employees, the identities of which are not yet known to The Regents).  Defendant USC did so knowing full well that Defendant Aisen, Tobias, Pizzola, and Jimenez-Maggiora were still employed by UCSD and, therefore, owed duties (including a duty of loyalty) to their then employer, UCSD.  Despite its public protestations to the contrary,  Defendant USC held "closed door" meetings to scheme and plan with Defendants Aisen, Tobias and Pizzola, and likely others, and did so in the very conference rooms occupied by the ADCS in offices being paid for *by UCSD*, with the intent to harm the Regents and the ADCS.

84.    The information that USC received from Defendants Tobias and Pizzola included data pertaining to each ADCS employees' title, job duties, and compensation.  Defendant USC then wrongfully used that information belonging to UCSD to offer almost all, if not all, of the ADCS employees a job with Defendant USC, and, in many cases, offering ADCS a material "signing bonus" if they resigned their employment with the ADCS abruptly and went to work immediately for Defendant USC.  Defendant USC then, in many cases, set the ADCS employees' start dates at Defendant USC on or close to the day after the date of their USC offer letter.  This scheme was designed to assure Defendant USC that the ADCS employees would resign their employment with UCSD and move immediately to Defendant USC without an orderly transition of their job responsibilities.  Many if not all of the ADCS employees then did exactly what Defendants pressured them to do, giving UCSD little if any advance notice of their resignation.  The Regents is informed and believe and thereon allege that Defendants Aisen, Tobias, Pizzola, and USC then used the facts of the resignations by many of the ADCS employees

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

against UCSD, by arguing that without many of its employees, UCSD could no longer fulfill its duties under the various grants and contracts.  Defendants engaged in a further effort to further intimidate UCSD and convince many of UCSD's third party study sponsors that they had no choice but to seek to move their studies with Defendant Aisen and his co-conspirators.  The premise was false.  Defendants Aisen and USC ignored that UCSD, as one of the top research institutions in the United States, had interim leadership in place to transition the duties abandoned by the former ADCS employees.  The Regents also incorporated by reference the allegations in Paragraphs 94, below, as if fully set forth in this paragraph.

85.    Defendant USC also aided and abetted the breaches of duties described above by assisting Defendants Jimenez-Maggiora and Hong, as well as Defendants Aisen and Pizzola, and the Individual Defendants (who worked as part of the ADCS Informatics Core) in determining the best method to transfer to USC the ADCS Data (which was stored within the EDC), and then either directly, or by turning a blind eye refusing UCSD's request to provide it with the needed passwords so that it could access its own system (the EDC) which was integral in enabling UCSD to carry out its duties under the various sponsor agreements.

86.    Defendant USC also assisted Defendants Aisen, Pizzola, and Tobias, in working to formulate a plan to replicate, almost verbatim, many of the documents used to operate the ADCS.  Defendants Gessert, Harless, and Shaffer also assisted Defendant USC in this effort.  Further, Defendant USC accepted the benefits of further bad acts committed by the then UCSD ADCS employees, who, in breach of their respective duties, took study files, documents, and data, and also in one case took the paperclips and name tags UCSD had paid for as part of operating the ADCS.

87.    This claim is not predicated on the theft of source code or other proprietary information or trade secrets owned by The Regents, or the infringement

CROWELL & MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

1    of copyright in software source code that was developed and is owned by The

2    Regents.

3        88.    The conduct of Defendant USC was a substantial factor in causing the

4    harm suffered by The Regents as a result of the breaches described above.  And, this

5    unlawful conduct caused and will continue to cause a very significant amount of

6    financial harm to The Regents.

7        89.    The above-recited actions of Defendant USC were done with malice,

8    fraud, oppression, and reckless disregard of the above described rights of The

9    Regents and within the meaning of California Civil Code § 3294.  Therefore, The

10   Regents is entitled to recover punitive damages against Defendant USC.

11                        **FOURTH CLAIM FOR RELIEF**

12   **(INTERFERENCE WITH CONTRACTUAL RELATIONS - AGAINST**
     **DEFENDANTS AISEN PIZZOLA, TOBIAS, JIMENEZ-MAGGIORA,**
13   **HONG, GESSERT, SHAFFER, USC, AND DOES 1-25)**

14       90.    The Regents incorporates herein, by way of reference, all other

15   paragraphs set forth in this FAC in support of this claim for relief.

16       91.    Valid contracts existed between The Regents and certain third parties.

17       92.    Defendants knew of the existence of said contracts.

18       93.    Defendants intended to disrupt the performance of the contracts

19   between The Regents and certain third parties.

20       94.    Defendants' conduct made it more expensive and difficult for The

21   Regents to perform under its contracts with third parties, and, unless corrective

22   action is taken by the court, The Regents will likely be unable to perform at all

23   under its contracts.

24       95.    By way of specific example, but not limitation, by refusing to turn over

25   the passwords and other documentation necessary for UCSD to access the Cloud-

26   based storage accounts, destroying data belonging to UCSD, stealing other

27   documents related to the various studies, and preventing The Regents from

28   exercising administrative control over the ADCS Data contained therein, and,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-34-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

among other things, creating the impression that all ADCS employees would lose their jobs unless they left to join the Individual Defendants at USC (and thereby causing a multiple number of them to resign *en masse*), Defendants have made it more difficult, if not impossible, for The Regents to comply with Sections 16.1 of the Lilly Clinical Trial Agreement, which requires UCSD to capture and maintain Study Data jointly with Lilly.  Further, Defendants' actions have made it difficult, if not impossible for The Regents to comply with Section 17.3 of the Lilly Clinical Trial Agreement, which forbids either party from disclosing the confidential information of the other.  Further, as one more example, Defendant Gessert, while employed by UCSD and receiving wages paid for by UCSD, worked at the direction of Defendant Aisen in meeting with Lilly and worked against the interests of UCSD in working to "transition" the Lilly A4 study away from UCSD and transition it to USC, where she would soon be employed.  As yet another example, Defendant Shaffer assisted Defendant USC in preparing the necessary paperwork to have its IRB approve of USC taking over the Lilly A4 study.  Again, like the actions of the other Individual Defendants, Shaffer did this while still employed by, and receiving a salary from, UCSD.  This claim is not about, nor is it predicated on, the theft of source code or other proprietary information or trade secrets owned by The Regents, or the "use" of software source code that was developed and is owned by The Regents.

96.     Defendants engaged in independently wrongful acts of conduct which violated common and statutory law and which interfered with performance of the contracts and made The Regents' performance more expensive and burdensome. The full extent of Defendants' wrongful conduct will be shown at trial after the opportunity for discovery.

97.     The above-recited actions of Defendants Aisen, Pizzola, Tobias, Jimenez-Maggiora, Hong, Gessert, Shaffer, and USC were done with malice, fraud, oppression, and reckless disregard of the above described rights of The Regents and

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

within the meaning of California Civil Code § 3294. Therefore, The Regents is entitled to recover punitive damages against Defendants Aisen, Pizzola, Tobias, Jimenez-Maggiora, Hong, Gessert, Shaffer, and USC.

## FIFTH CLAIM FOR RELIEF

**(INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE – AGAINST DEFENDANTS AISEN, PIZZOLA, TOBIAS, JIMENEZ-MAGGIORA, HONG, USC, GESSERT, SHAFFER AND DOES 1-25)**

98.     The Regents incorporates herein, by way of reference, all other paragraphs set forth in this FAC in support of this claim for relief.

99.     Economic relationships existed between The Regents and the sponsors of the ADCS, including, but not limited to, Lilly, Toyama, and the NIA, containing a past and probable future economic benefit or advantage to The Regents.

100.   Defendants knew of these relationships.

101.   Defendants intended to interfere with these relationships in order to foster their own relationship with the ADCS sponsors, and the relationship between the Individual Defendants and Defendant USC.

102.   As described more fully above, Defendants engaged in tortious and wrongful conduct, including the conversion of UCSD property, causing damage to UCSD's network and systems.

103.   This claim is not about, nor is it predicated on, the theft of source code or other proprietary information or trade secrets owned by The Regents, or the "use" of software source code that was developed and is owned by The Regents.

104.   As a result of Defendants' tortious conduct, The Regent's relationship with the ADCS program sponsors was disrupted and UCSD has been harmed in ways that will be shown at trial. Defendants' conduct was a substantial factor in causing The Regent's harm.

105.   The above-recited actions of Defendants Aisen, Pizzola, Tobias, Jimenez-Maggiora, Hong, Gessert, Shaffer, and USC were done with malice, fraud,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

oppression, and reckless disregard of the above described rights of The Regents and within the meaning of California Civil Code § 3294. Therefore, The Regents is entitled to recover punitive damages against Defendants Aisen, Pizzola, Tobias, Jimenez-Maggiora, Hong, Gessert, Shaffer, and USC.

## SIXTH CLAIM FOR RELIEF

### (COMMISSION OF COMPUTER CRIMES PURSUANT TO CALIFORNIA PENAL CODE SECTION 502(C) AGAINST ALL DEFENDANTS)

106.   The Regents incorporates herein, by way of reference, all other paragraphs set forth in this FAC in support of the above-referenced claim for relief.

107.   Penal Code, Section 502 imposes liability on one who:

- Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;

- Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;

- Knowingly and without permission uses or causes to be used computer services;

- Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network;

- Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network

in violation of this section;

• Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network; or

• Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

108. All Defendants violated Penal Code, Section 502, by doing the acts described above, including, without limitation: (a) the knowing and unapproved of disruption of the ability of UCSD to access its own computer systems and the ADCS Data; (b) the movement of the ADCS Data to AWS and changing the ownership of the account into the name of Defendant Aisen; (c), the refusal to return passwords that were exclusively in the possession, custody and control of Defendants Aisen, Jimenez-Maggiora and Hong; and (d), the deletion of data from the UCSD computers and computer systems (in part to slow down UCSD's ability to continue to perform the obligations it is required to perform under the governmental and private contracts, and also to cover up their misdeeds.

109. As a direct and proximate result of Defendants' wrongful conduct, Defendants have been unjustly enriched, and The Regents has been harmed and The Regents has sustained damages in an amount to be proven at trial.

110. As recently confirmed in *United States v. Christensen*, No. 08-50531, 2015 WL 5010591, at *14 (9th Cir. Aug. 25, 2015), contrary to the Defendants' earlier contentions (in previously-filed motions), California Penal Code § 502(c)(2) is not primarily an "anti-hacking statute." Section 502(c) applies even to an employee who accesses a database or system with a valid password, but proceeds to take, copy, or use data without permission to do so. Additionally, this claim is not about, nor is it predicated on, the theft of source code or other proprietary information or trade secrets owned by The Regents, or the "use" of software source code that was developed and is owned by The Regents.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-38-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

111.    The Regents also has suffered irreparable harm as a result of Defendants' activities and will continue to suffer irreparable injury that cannot be adequately remedied at law unless Defendants, and their officers, agents and employees, and all other persons acting in concert with them, are enjoined from engaging in any further such acts.

## SEVENTH CLAIM FOR RELIEF
### (CONVERSION- ALL DEFENDANTS)

112.    The Regents incorporates herein, by way of reference, all other paragraphs set forth in this FAC in support of the above-referenced claim for relief.

113.    This claim is not about, nor is it predicated on, the theft of source code or other proprietary information or trade secrets owned by The Regents, or the "use" of software source code that was developed and is owned by The Regents.  Rather, The Regents contractually owned (or at least jointly owned with the sponsors) all data related to the ADCS project, as well as the data and contents of Amazon Account No. 675713428646, and the data contained on the UCSD laptop computers issued to the Individual Defendants, i.e., the ADCS Data.  Additionally, the Individual Defendants are known to have taken physical property as well, including mobile phones, laptops as well as numerous regulatory documents, each of which belonged to UCSD.

114.    The Defendants, and each of them, have wrongfully exercised dominion and control over the ADCS Data, and the other tangible documents referenced herein, and have intentionally and substantially interfered with The Regents' ownership of the ADCS Data, as more fully described above.  In other words, Defendants' tortious conduct, on which this claim of conversion is based, consists of Defendant's physical acts of taking of tangible and intangible property belonging to UCSD, including, but not limited to the ADCS Data, and electronic copies of documents owned by UCSD, as well as tangible property including

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

1  physical documents and supplies owned by UCSD, which individuals, like

2  Defendants Gessert, Harless, and Shaffer took prior to leaving UCSD.

3      115.   As a direct and proximate result of the wrongful and tortious conduct

4  of Defendants as alleged herein, Defendants have been unjustly enriched and The

5  Regents has suffered, and will continue to suffer, substantial damages including, but

6  not limited to, costs incurred recovering data owned or controlled by The Regents,

7  the loss of property owned by The Regents, and costs incurred with repairing and

8  monitoring UCSD's network, and in other ways that will be shown at trial.

9  Defendants' actions were a substantial factor in causing The Regents' harm.

10     116.   The above-recited actions of Defendants were done with malice, fraud,

11  oppression, and reckless disregard of the above described rights of The Regents and

12  within the meaning of California Civil Code § 3294.  Therefore, The Regents is

13  entitled to recover punitive damages against Defendants.

14                    **EIGHTH CLAIM FOR RELIEF**

15  **(VIOLATION OF GOV'T CODE § 87100 – AGAINST DEFENDANT AISEN)**

16     117.   The Regents incorporates herein, by way of reference, all other

17  paragraphs set forth in this FAC in support of the above-referenced claim for relief.

18     118.   By virtue of his appointment as the Director of the ADCS with the

19  University of California, Defendant Aisen is a public official subject to the

20  California Political Reform Act of 1974, California Gov't Code § 8100, *et seq.*

21     119.   Defendant Aisen participated in making, and attempted to use his

22  official position to influence multiple government decisions.  For example,

23  Defendant Aisen participated in making, and attempted to use his official position to

24  influence, the NIH's decision to provide continued funding to ADCS and to

25  potentially transfer NIH's grant from UCSD to USC.  By way of specific example,

26  but not limitation, Defendant Aisen made requests to transfer federal funds to USC,

27  and contacted NIH representatives on May 21, 2015 regarding his attempt to

28  "complete the transition to a USC affiliation."  Defendant Aisen also wrote in his

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-40-

SFACTIVE-903800463.3

capacity "as senior administrative officer at the ADCS" to have UCSD license its electronic data system to USC.  *See* Exhibit 5 (the June 21, 2015 email from Defendant USC's Buchanan which was forwarded by Defendant Aisen prior to his abrupt resignation to his co-conspirator Defendant Pizzola, who, at the time, was still employed and being paid by UCSD).

120.   It was reasonably foreseeable that the government decisions detailed in Paragraph 119 would have a material financial effect on Defendant Aisen's interests.  Defendant Aisen stood to personally benefit by receiving, among other things, a $500,000 salary and assistance with financing on a new home.

121.   The financial effect of the governmental decisions detailed in Paragraph 119 was distinct from its effect on the public generally.

122.   As a public official with a conflict of interest, Defendant Aisen violated California Gov't Code § 87100 by participating in and attempting to influence the NIH's continued funding and potential grant transfer as well as UCSD's potentially licensing its electronic data capture system to USC.

123.   Pursuant to Gov't Code § 91003(b), The Regents seeks to preliminarily restrain the execution of any official action in relation to which the violations set forth above occurred, pending final adjudication.  Ultimately, when it is finally determined that a violation of Section 87100 has occurred, The Regents seeks an order from the Court that the official action be set aside as void.

## NINTH CLAIM FOR RELIEF

### (VIOLATION OF GOV'T CODE § 87407 – AGAINST DEFENDANT AISEN)

124.   The Regents incorporates herein, by way of reference, all other paragraphs set forth in this FAC in support of the above-referenced claim for relief.

125.   By virtue of his appointment as Director of the ADCS with the University of California, Defendant Aisen is a public official subject to the California Political Reform Act of 1974, California Gov't Code § 8100, *et seq.*

CROWELL
& MORING LLP
ATTORNEYS AT LAW

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

126.   Defendant Aisen participated in making, and attempted to use his official position to influence, multiple government decisions.  For example, Defendant Aisen participated in making, and attempted to use his official position to influence, the NIH's decision to provide continued funding to ADCS and to potentially transfer NIH's grant from UCSD to USC.  By way of specific example, but not limitation, Defendant Aisen made requests to transfer federal funds to USC, and he contacted NIH representatives on May 21, 2015 regarding his attempt to "complete the transition to a USC affiliation."  *See* Exhibit 3 at p. 4.  Defendant Aisen also wrote in his capacity "as senior administrative officer at the ADCS" to have UCSD license its electronic data system to USC.  *See* Exhibit 5.

127.   While Defendant Aisen was participating in and attempting to influence the governmental decisions details in Paragraph 126, USC was Defendant Aisen's prospective employer.  Defendants Aisen and USC were in negotiations and developing the parameters of Defendant Aisen's forthcoming employment.

128.   The governmental decisions described in Paragraph 126 were directly related to USC, because USC stood to benefit from both the NIH potentially transferring its grants as well as UCSD's potentially licensing its electronic data capture system to USC.

129.   Pursuant to California Gov't Code § 91003(b), The Regents seeks to preliminarily restrain the execution of any official action in relation to which the violations set forth above occurred, pending final adjudication.  Ultimately, when it is finally determined that a violation of Section 87407 has occurred, The Regents seeks an order from the Court that the official action be set aside as void.

**TENTH CLAIM FOR RELIEF – ADDENDUM TO ALL CAUSES OF ACTION**

**(CIVIL CONSPIRACY – ALL DEFENDANTS)**

130.   The Regents incorporates herein, by way of reference, all other paragraphs set forth in this FAC in support of the above-referenced claim for relief.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-903800463.3

131.   Defendants, and each of them, were aware that Defendant Aisen and Defendant USC planned to interfere with The Regents' contractual and economic relations with the NIA, with ADCS sponsors, and with UCSD employees, and that they planned for Dr. Aisen to act as a double-agent by advancing his personal interests and those of USC while he was still employed by The Regents.

132.   Defendants, and each of them, with full knowledge and intent and without justification, agreed to act in concert with Defendants Aisen and USC to commit the tortious acts against The Regents described in this FAC in order to further their personal financial gain and to aid in the formation of their new venture, and to harm The Regents and UCSD.

133.   As a result of the wrongful and tortious conduct of Defendants as alleged herein, Defendants have been unjustly enriched and The Regents has suffered, and will continue to suffer, damages in ways and amounts that will be shown at trial.

WHEREFORE, The Regents prays for Judgment against Defendants and each of them as follows:

1.     For compensatory damages, according to proof;

2.     For preliminary and permanent injunctive relief;

3.     For restitution and/or disgorgement of profits;

4.     For punitive damages;

5.     For attorneys' fees;

6.     For costs of suit incurred herein;

7.     For a trial by jury; and

/ / /

/ / /

/ / /

/ / /

/ / /

Crowell
& Moring LLP
Attorneys At Law

-43-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3

8.     For such other and further relief as the Court may deem proper.

Dated:  September 8, 2015          CROWELL & MORING LLP


                                   s/ Mark A. Romeo
                                   Mark A. Romeo (CA Bar No. 173007)
                                   Attorneys for Plaintiff and Counterclaim-
                                   Defendant
                                   THE REGENTS OF THE UNIVERSITY OF
                                   CALIFORNIA
                                   E-mail:  mromeo@crowell.com

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-44-

FIRST AMENDED COMPLAINT FOR MONEY
DAMAGES AND EQUITABLE RELIEF
CASE NO. 3:15-cv-01766-BEN-BLM

SFACTIVE-903800463.3