1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | CASE NO. 15-cv-1766-BEN (BLM) |
| Plaintiff, | **ORDER DENYING MOTION TO DISMISS CROSS-CLAIMS** |
| vs. | |
| PAUL S. AISEN, et al., | |
| Defendants. | |

Plaintiff and Cross-Defendant the Regents of the University of California ("University of California") moves to dismiss the Cross-Complaint of Paul S. Aisen and the University of Southern California ("USC"). Plaintiff and Cross-Defendant the University of California asserts immunity from suit based on the Eleventh Amendment, California Government Code § 815, and the failure to state claims for relief under Federal Rule of Civil Procedure 12(b)(6). Because it is a motion to dismiss, unlike a trial, the well-pleaded facts alleged are accepted as true and the Cross-Complainants are given the benefit of the doubt. At this juncture of the proceedings, the motion to dismiss is denied.

## I. Eleventh Amendment Immunity

The University of California asserts that because it is an entity of the State of California, it is completely immune from suit in federal court under the Eleventh

15cv1766

Amendment to the United States Constitution.  There is no question that the University of California is an entity of the State of California.  And there is no question that the Eleventh Amendment protects states from being haled into federal courts as defendants without consent.  Nevertheless, a state may waive its sovereign immunity.  *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999).  One way in which a state waives its immunity is by voluntarily appearing in court as a plaintiff.  *Id.* at 676 (citing *Gunter v. Atl. Coast Line R.R. Co.*, 200 U.S. 273, 284 (1906)).

The University of California voluntarily appeared in court and brought suit against Aisen and USC.  The University of California did so in state court.  It did not seek removal to federal court.  The question then becomes, are principles of sovereign immunity violated when a plaintiff state entity, voluntarily prosecuting a claim, is forced into federal court by operation of the federal removal statute?  The Ninth Circuit Court of Appeals answered that precise question in *Lockyer v. Dynegy, Inc.*, 375 F.3d 831 (9th Cir. 2004), a decision highlighted by Cross-Plaintiffs in their opposition brief.  *Dynegy* held that when a state affirmatively waives immunity by voluntarily filing suit in a state court (as it did here) and the defendant removes the suit to federal court, the state cannot invoke Eleventh Amendment immunity.  *Id.* at 848 ("[W]e hold that a state that voluntarily brings suit as a plaintiff in state court cannot invoke the Eleventh Amendment when the defendant seeks removal to a federal court of competent jurisdiction.  In so holding, our conclusion is consistent with those of our sister circuits.").  *Dynegy* has been cited in other court decisions 1,500 times and remains good law.  And *Dynegy* controls here.  The University of California has waived its Eleventh Amendment immunity by voluntarily appearing in state court as a plaintiff and bringing suit against Defendants and Cross-Plaintiffs.  The University of California voluntarily placed itself under the jurisdiction of a court.  That it did not foresee it would be a

federal court, does not invalidate its waiver.  Therefore, the motion to dismiss the Cross-Claims on the basis of Eleventh Amendment immunity is denied.

## II.  California Government Code § 815 Immunity

For Cross-Claims three, four, five, and six, Cross-Defendant the University of California also argues that it is immune from suit based on California Government Code § 815.  While § 815 precludes tort claims brought directly against the State, claims brought on the basis of vicarious liability may be prosecuted by virtue of §815.2(a).  *See e.g., Unruh-Haxton v. Regents of the Univ. of Cal.*, 162 Cal. App. 4th 343 (2008) (finding claims adequately pleaded against Regents as vicariously liable for physician employees' malpractice).  To the extent the University of California would be vicariously liable for the torts of its employees, the cross-claims are not barred by § 815.  *Wells v. Regents of Univ. of Cal.*, Case No. 15cv1700SI, 2015 WL 5138181, at *6 (N.D. Cal. Sept. 1, 2015) ("A public entity, however, which state law defines to include the Regents, is generally not liable in tort except as authorized by statute.  *See* Cal. Gov't Code §§ 811.2, 815; *see also AE ex rel Hernandez,* 666 F.3d at 631, 638 (9th Cir. 2012).  One such statute allows a plaintiff to hold a public entity vicariously liable for the actions of its employee, unless the employee is also immune.  *See* Cal. Gov't Code § 815.2; *C.A. v. William S. Hart Union High Sch. Dist.,* 53 Cal.4th 861, 868 (2012).").

## III.  Rule 12(b)(6) Failure to State a Claim

"[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).  Motions to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), test the sufficiency of this required showing.

1   *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1094 (9th Cir.

2   2011).  These rules apply equally to complaints and cross-complaints.

3        The following facts are found in the Cross-Complaint and are taken as true

4   solely for the purposes of this Rule 12(b)(6) motion to dismiss.[1]  Cross-Plaintiff

5   Paul Aisen, M.D., has worked with the Alzheimer's Disease Collaborative Study for

6   23 years; he has been the Director since 2007.  Aisen is the Principal Investigator of

7   the clinical studies that make up the Alzheimer's Disease Collaborative Study.

8   Cross-Plaintiff USC hired Aisen and many of his staff to continue pursuing the

9   clinical studies that make up the Alzheimer's Disease Collaborative Study.

10       As Principal Investigator, Aisen effectively acts as the supervising physician

11  for every patient involved in clinical trials.  Aisen treats the clinical study patients

12  by monitoring their health, determining proper drug dosages, and guiding activities

13  at participating clinical sites on a minute-by-minute and real-time basis.  When an

14  unexpected event occurs, such as unusual toxic reactions to the drugs or side effects

15

16      [1] Plaintiff and Cross-Defendant the University of California ask this Court to
    take judicial notice of a number of exhibits.  Many are already part of the record from
17  the state court filings in this case and the existence of these filings may be judicially
    noticed (*i.e.* exhibits 1 and 5 through 9).  Other exhibits such as private emails and
18  media articles are not judicially noticeable.  The request as to these exhibits is denied
    (exhibits 2, 10 and 11).
19      A third category of exhibits are described as "UCOP policies" which it is argued
    have the same effect as state laws (exhibits 3 & 4).  Apparently, "UCOP" refers to
20  University of California Office of the President, Presidential Policies, of which there
    appear to be 426 in number.  Usually, documents found on internet websites are too
21  ephemeral for the taking of judicial notice.  The web addresses cited in the request to
    take judicial notice are not pinpoint cites.  Instead they take the internet visitor to a
22  general page of University of California personnel policies which in turn offers links
    to more than 80 sub-pages.  Some linked sub-page documents claim a recent issuance
23  date such as the December 15, 2015 date of "PPSM-30: Compensation."  This policy
    apparently did not exist at the time of the events described in the Cross-Complaint, and
24  would have no relevance here.  Other documents have issue dates from years ago such
    as the 1996 policy "PPSM-63: Investigatory Leave," and it is not clear that such
25  policies are still in effect.  Regardless, the Court declines to take judicial notice of the
    requested exhibits because they are not the types of documents from which a court
26  make take notice of an adjudicative fact under Federal Rule of Evidence 201.  *C.f.*
    *Lopez v. Regents of Univ. of Cal.*, 5 F. Supp. 3d. 1106, n. 4 (N.D. Cal 2013) (noting
27  existence / fact distinction).  Therefore, the objections are sustained as to exhibits
    numbered 2-4 and 10-11).  The other exhibits are already part of the record.
28

from the interaction of multiple drugs, clinicians contact Aisen directly to assist in the treatment of the patients.

Historically, the Study has been housed at the University of California, San Diego ("UCSD").  The Study relies on a computer data system known as the Electronic Data Capture system (or "EDC").  According to the Cross-Complaint, "the EDC is a custom-designed, highly complex and specialized data system.  It reflects a collaboration of the federal government, private foundations, and pharmaceutical companies who have invested hundreds of millions of dollars over several decades in Alzheimer's research."  Moreover,

> The EDC is an electronic filing cabinet that maintains the entirety of the data for the various ADCS clinical trials. Each study has its own "drawer" in the EDC filing cabinet, which includes, among other things, highly sensitive information related to patients that are participating in clinical trials and observational studies. . . . Data in the EDC includes information from clinical trials being sponsored by third party grant funders/sponsors (such as pharmaceutical companies Toyama Chemical and Eli Lilly & Co.) and houses data for researchers at institutions across the country.

Cross-Complaint at ¶ 27.

Since becoming the Director, Aisen sought from UCSD infrastructure and support needed to grow the Alzheimer's Disease Collaborative Study for new grants and studies.  Aisen had little success.  In January 2014, Aisen met with the ADCS Steering Committee to express his opinions on the problems at UCSD.  The Steering Committee is an organization of 35 doctors and researchers from across the country who are responsible for managing the ADCS program and making strategic decisions.  The Steering Committee supported Aisen's decision to find another institutional home for ADCS.

In December 2014, UCSD officials, including Cross-Defendants Brenner and Mobley, became aware that Aisen was discussing employment with Cross-Plaintiff USC.  UCSD formed a retention committee.  The committee held many meetings

with Aisen.  According to the Cross-Complaint, in May 2015, after Aisen told the study sponsors and his staff that he was considering moving to USC, the Cross-Defendants "embarked on a course of actions designed to interfere with such a move" in an effort to stop him.

On May 22, 2015, Cross-Defendants cut off all of Aisen's electronic access to the university systems, including email, phones, and servers.  Since Aisen relied on the university electronic systems for many aspects of his medical practice, including the determination and adjustment of experimental drug dosage for clinical patients, the blocking of access interfered with Aisen's physician-patient relationships, compromised patient safety, and threatened the integrity of the research.

On May 23, 2015, Aisen met with Cross-Defendant Mobley.  As a condition of continuing employment and restored access, Cross-Defendant Mobley demanded that Aisen sign an Oath of Loyalty.  The Oath of Loyalty included this language: "As the Director of the ADCS at UC San Diego, I understand that I owe the University a duty of loyalty and may not act against the University's interests" and that all ADCS data "belonged solely to UCSD."  Mobley conditioned reconnecting Aisen's electronic access on his willingness to sign and agree to the loyalty oath, stating that "If you sign this, we may be able to restore your electronic access."  The Cross-Defendants refused to restore Aisen's access.  Four days later, the National Institute of Health intervened with the Cross-Defendants to restore Aisen's access.  On June 18, 2015, Aisen tendered his resignation to UCSD.

Aisen alleges that after he refused to sign the Oath of Loyalty, the Cross-Defendants set out to destroy his reputation in academia.  Cross-Defendant Mobley defamed Aisen's name and professional reputation.  Mobley allegedly leveled threats against Aisen and those planning to work with Aisen.  Mobley allegedly threatened to "'have Dr. Aisen arrested, put in jail, and [have] his medical license

1    suspended.'"

2          For example, it is alleged that when Sarah Walter, a member of Aisen's team,

3    tendered her resignation to UCSD, Mobley called her into his office at UCSD and

4    stated that Aisen had behaved unethically and that he and the UCSD employees who

5    resigned to join Aisen at USC were criminals.  UCSD officials have also allegedly

6    attempted to prevent other employees from leaving UCSD and joining Aisen at

7    USC.  When other employees tendered notices of resignation, UCSD officials also

8    withheld final paychecks of a number of departing employees unless they agreed to

9    participate in an exit interview, and failed to reimburse employees for travel

10   expenses properly incurred while they were UCSD employees.

11         It is also alleged that on July 25, 2015, Cross-Defendant Mobley phoned a Dr.

12   Michael Weiner of University of California San Francisco, the Principal

13   Investigator of the ADNI study.  According to the Cross-Complaint, "Dr. Mobley

14   advised Dr. Weiner against working with Dr. Aisen and USC in the future. Dr.

15   Mobley also stated that Dr. Aisen was a criminal and that UCSD intended to have

16   'Dr. Aisen arrested, put in jail, and his medical license suspended.'"  Mobley

17   allegedly made these false and defamatory statements in an effort to induce Dr.

18   Weiner to breach his agreement to move the ADNI study to USC.

19         Based upon these and other factual allegations, Cross-Plaintiffs state six

20   claims for relief: (1) a violation of the California Constitution; (2) a violation of

21   civil rights pursuant to 42 U.S.C. § 1983; (3) defamation; (4) tortious interference

22   with patient relations; (5) tortious interference with contracts; and (6) tortious

23   interference with prospective economic advantage.  Cross-Defendants move to

24   dismiss each claim for failure to state a claim upon which relief can be granted.

25         **A.  Violation of the California Constitution's Singular Oath**

26         Cross-Plaintiffs correctly allege that the California Constitution Article XX,

27   § 3, prescribes the language of the oath of office for every California state

28

1  employee.  The constitutional provision specifically defines "public employee" to

2  include employees of the University of California.  Section 3 also provides that no

3  other oaths or declarations may be required as an employment qualification for a

4  public employee.  *See* Cal. Constitution Art. XX, § 3 ("And no other oath,

5  declaration, or test, shall be required as a qualification for any public office or

6  employment.").  It is this prohibition on other oaths and declarations that Cross-

7  Plaintiffs allege was violated by the University of California and Mobley when

8  Mobley allegedly presented Aisen a different loyalty oath as a condition of Aisen's

9  continued employment at UCSD.

10      The Cross-Complaint states, "[t]he 'Oath of Loyalty' that Cross-Defendants

11  sought to impose on Dr. Aisen, as a condition to restoring electronic access,

12  required that he pledge: 'As a Director of the ADCS at UC San Diego, I understand

13  that I owe the University a duty of loyalty and may not act against the University's

14  interests.'" (Cross-Complaint, at ¶98.)  State law is clear that the University of

15  California may not require an university employee to execute any loyalty oath or

16  declaration that is different from that which is set out in Article XX, § 3.  That

17  question was settled one-half century ago by the California Supreme Court.  *See*

18  *Tolman v. Underhill*, 39 Cal. 2d 708, 713 (1952) ("[T]he Legislature has enacted a

19  general and detailed scheme requiring all state employees to execute a prescribed

20  oath relating to loyalty and faithful performance of duty, and it could not have

21  intended that they must at the same time remain subject to any such additional

22  loyalty oaths or declarations as the particular agency employing them might see fit

23  to impose.  Multiplicity and duplication of oaths and declarations would not only

24  reflect seriously upon the dignity of state employment but would make a travesty of

25  the effort to secure loyal and suitable persons for government service.").  *Tolman*

26  invalidated an additional oath of loyalty required of faculty members by the

27  University of California.  *Id.*

28

1    Cross-Defendants argue that the oath put to Aisen was not really an oath of

2    loyalty, but simply "a reminder of the legal obligations owed by any employee in

3    California."  Aisen did not set out the entire language of the oath in his Cross-

4    Complaint.  The University of California offers an email purporting to contain the

5    entire language of the oath and asks that judicial notice be taken.  The Court

6    declines to take judicial notice of the email as the facts are subject to reasonable

7    dispute.  Fed. R. Evid. 201; n. 1, *supra*.  The University of California also argues

8    that the oath was a proper exercise of its authority to promulgate and enforce

9    Internal Policies.  This is similar to an argument rejected by the *Tolman* court.  39

10   Cal. 2d at 712 ("It is well settled, however, that laws passed by the Legislature

11   under its general police power will prevail over regulations made by the regents

12   with regard to matters which are not exclusively university affairs.").  *Tolman* held

13   that an oath required of a faculty member was a matter of general state concern, and

14   that the state law occupied exclusively the field of law.  *Id.* ("There can be no

15   question that the loyalty of teachers at the university is not merely a matter

16   involving the internal affairs of that institution but is a subject of general statewide

17   concern.").  As a result, the additional oath promulgated by the University of

18   California was deemed to be invalid.  *Id.* at 713 ("We are satisfied that the

19   Legislature intended to occupy this particular field of legislation . . . and that there

20   is no room left for supplementary local regulation.  The declaration as to loyalty

21   required by the regents is, accordingly, invalid.") (citations omitted).  The

22   University of California also argues that Aisen has not suffered, and has not alleged

23   that he has suffered, damages.  But Aisen has clearly alleged both causation and

24   damages.  (*See* Cross-Complaint ¶ 105.)

25   The Cross-Complaint clearly alleges a claim for relief under state law for

26   violating the California Constitution Article XX, § 3.  Proof of the claim and factual

27   disputes must wait to be resolved by summary judgment or trial.

28

## B.   Violation of Civil Rights Pursuant to 42 U.S.C. § 1983

Cross-Defendant the University of California also seek to dismiss the second Cross-Claim for relief alleging Mobley violated Aisen's First Amendment right to free academic speech by requiring Aisen to sign the oath of loyalty to UCSD.  This claim is brought solely against Mobley.  Mobley has not joined in the motion to dismiss filed by the University of California.  Therefore, the motion is denied.  Even if Mobley were to challenge the claim on these arguments, the claim would survive.

The University of California argues that Aisen was not asked to compromise his freedom of speech or academic freedom.  Aisen was asked only to abide by UCSD's internal policies.  But, as discussed above, this was allegedly an oath different from that which is set forth in the California Constitution, and thus one not permitted by state law.  Aisen alleges that the loyalty oath was required of him and that the demanded expression of loyalty to UCSD infringed on his right to freely consider other positions in academia.  Almost 50 years ago, the United States Supreme Court considered an oath required of faculty of the University of Maryland.  *See Whitehill v. Elkins*, 389 U.S. 54 (1967).  It was a different oath.  It required a faculty member to state that he or she was not engaged in any attempt to overthrow the Government of the United States, or the State of Maryland, by force or violence.  *Id.* at 55.  The Court found the oath to be problematic and to unconstitutionally cramp academic freedom protected by the First Amendment.  *Id.* at 60-62.  ("The essentiality of freedom in the community of American universities is almost self-evident.  No one should underestimate the vital role in a democracy that is played by those who guide and train our youth.  To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.").  While the oath of loyalty to UCSD alleged in this case bears on a different subject than the oath required in *Whitehill*, the First Amendment concerns for the academic freedom of university faculty are similar.  *See also*

1   *Keyishian v. Bd. of Regents of Univ. of State of New York*, 385 U.S. 589, 603 (1967)

2   ("Our Nation is deeply committed to safeguarding academic freedom, which is of

3   transcendent value to all of us and not merely to the teachers concerned. That

4   freedom is therefore a special concern of the First Amendment, which does not

5   tolerate laws that cast a pall of orthodoxy over the classroom."). The facts alleged

6   by Aisen are sufficient to claim a violation of First Amendment rights in violation

7   of § 1983.

8          The University of California also argues that Aisen suffered no damages

9   because he never signed the loyalty oath. Aisen argues that, regardless of his

10  ultimate choice, Mobley was not permitted to force him to choose between

11  continued UCSD employment and the exercise of his First Amendment rights. The

12  doctrine of unconstitutional conditions permits the allegation of a claim without

13  monetary damages from the forcing of an unconstitutional choice between

14  competing rights. *Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 133

15  S. Ct. 2321, 2328 (2013) ("At the same time, however, we have held that the

16  Government may not deny a benefit to a person on a basis that infringes his

17  constitutionally protected ... freedom of speech even if he has no entitlement to that

18  benefit.") (internal quotations and citations omitted). Consequently, if Mobley were

19  to bring a motion to dismiss the second Cross-Claim for relief based on these

20  arguments, it would be denied.

21         **C. Defamation**

22         The third Cross-Claim for relief alleges Mobley made a series of defamatory

23  statements about Aisen. The University of California move to dismiss the claim

24  arguing that the statements are merely opinion or hyperbole and are not actionable.

25  They also argue that Aisen is a "public official" or a "public figure" requiring the

26  pleading of actual malice.

27         Mobley is alleged to have said to others in Aisen's field of work that Aisen is

28  a criminal, unethical, would be arrested, would be put in jail, and would have his

medical license suspended.  If the allegations prove to be accurate, it is not likely that a jury will find that such statements are merely non-actionable rhetorical hyperbole.  On the contrary, under California law, these are the types of statements that are defamatory *per se*.  *See Grenier v. Taylor*, 234 Cal. App. 4th 471, 486 (2015) ("False statements that accuse the plaintiff of criminal conduct are defamatory on their face."); *Del Junco v. Hufnagel*, 150 Cal. App. 4th 789, 798 (2007) ("Accusing a physician of being untrained and lacking the proper credentials are not statements of opinion.  They are statements of fact."); Cal. Civ. Code § 46(1) and (3) (identifying as slander publications that charge a person with a crime or that tend directly to injure a person with respect to his profession).  As alleged, these statements are actionable.

The University of California also argues that Aisen is a public figure that requires actual malice to be alleged.  "There are two classes of public figures.  The first is the 'all purpose' public figure who has 'achieved such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.'"  *Grenier*, 234 Cal. App. 4th at 484 (citations omitted).  Aisen does not fit that category.  "The second category is that of the 'limited purpose' or 'vortex' public figure, an individual who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'"  *Id.* (citations omitted).  It is argued that Aisen thrust himself into the forefront of the controversy over his departure for the USC by authoring opinion pieces and press releases and giving interviews.  Perhaps so.  But those facts are not in the Cross-Complaint.  Nor is it alleged that such remarks, if made by Aisen to thrust himself to the forefront, were made before Mobley's alleged triple defamation.  To require actual malice, the false statement must come after the person defamed has become a public figure.  *Id*. ("Once the plaintiff places himself or herself in the spotlight on a topic of public interest, his or her private words and acts relating to that topic become fair game.").  Defamation cannot be excused by

the fact that a private person goes public for the first time in order to defend his

tarnished reputation.  The University of California's argument relies on facts which

may, or may not, be established in a motion for summary judgment or a trial.  The

University of California asks the Court to take judicial notice of opinion pieces and

news articles about Aisen.  However, this the Court declines to do.  (*See* n. 1,

*supra*.)  At this point the Cross-Claim for defamation is sufficiently pled.

### D.  Tortious Interference with Patient Relations

The University of California next argues that the fourth Cross-Claim for relief

should be dismissed.  The fourth Cross-Claim alleges tortious interference with

existing physician-patient relations.  This California state law claim for relief is best

described in *Janda v. Madera Cmty. Hosp.*, 16 F. Supp. 2d 1181, 1189 (E.D. Cal.

1998).  Where the economic relationship is between a physician and his patient:

> Under California law, an actionable cause of action
> for intentional interference with prospective economic
> advantage requires plaintiff allege: (1) an economic
> relationship between the plaintiff and some third party,
> with the probability of future economic benefit to the
> plaintiff; (2) defendant's knowledge of the relationship;
> (3) intentional acts on the part of the defendant designed
> to disrupt the relationship; (4) actual disruption of the
> relationship; and (5) economic harm to the plaintiff
> proximately caused by the acts of the defendant.

*Janda*, 16 F. Supp. 2d at 1189 (citations omitted).  In the Cross-Complaint, Aisen

alleges he had preexisting physician-patient relationships with patients in the

clinical trials.  Aisen alleges that he was "actively involved in the medical care of

the patients in the study and was acting pursuant to ongoing relationships he

maintains with the  patients."  (Cross-Claim at ¶ 125.)  He alleges that the Cross-

Defendants committed intentional acts designed to disrupt, and which actually did

disrupt, the relationships.  He alleges he suffered substantial economic harm.

Cross-Defendants argue facts suggesting the allegations will not be proven.

However, as the court in *Janda* concluded, "[t]his pleading, even if improvable,

survives a motion to dismiss . . . .  The substantive law of California does not require

1   more. " *Janda*, 16 F. Supp. 2d at 1189 (citations omitted).  The motion to dismiss
2   the fourth Cross-Claim is denied.

3               **E.  Tortious Interference with Contract – Existing and Prospective**

4           The fifth and sixth Cross-Claims for relief allege claims of tortious
5   interference with contract.  The fifth claim alleges interference with an existing
6   contract while the sixth alleges interference with a prospective contract.  The claims
7   are based upon the allegations that Cross-Claimants and Dr. Weiner of UCSF had
8   entered into an agreement to award an ADNI subcontract to Cross-Claimants
9   effective August 1, 2015.  They allege that Mobley and others intentionally
10  interfered, pressured, and influenced Weiner (also a faculty member employed by
11  the University of California) to rescind the subcontract.  For example, it is alleged
12  that Mobley told Weiner that Aisen was a criminal and that UCSD intended to have
13  him arrested, put in jail, and have his medical license suspended.  (Cross-Complaint
14  at ¶ 136.)  The University of California contends that the claims lack essential
15  elements and are self-contradictory and incomprehensible.  It also contends that the
16  absence of the written contract as an attachment to the Cross-Complaint
17  renders the claims impermissibly vague.

18          The two claims may be inconsistent and still satisfy the Federal Rule of Civil
19  Procedure 8.  *See* Fed. R. Civ. P. 8(d)(3) (a party may state inconsistent claims).
20  The claims are short and plain, simple and concise, thereby satisfying Rule 8(a) and
21  (c)(1).  The contract described in the claims does not have to be attached as an
22  exhibit to the Cross-Complaint.  *See e.g., Richards Indus. Park, LP v. FDIC*, 572 F.
23  App'x 499, 502-03 (9th Cir. 2014) ("The provision for incorporation of exhibits in
24  Rule 10(c) is permissive only, and there is no requirement that the pleader attach a
25  copy of the writing on which his claim for relief or defense is based.") (quoting 5A
26  Charles Alan Wright, Miller & Kane, *Federal Practice and Procedure* § 1327 (3d
27  ed. 2004)).  While it remains for another time for the Cross-Claimants to prove the
28  existence of a contract (written or oral) and any interference from the Cross-

1   Defendants, the fifth and sixth Cross-Claims for relief are sufficiently stated.  The

2   motion to dismiss is denied.

3                                    **CONCLUSION**

4            The Cross-Defendant Regents of the University of California is not immune

5   from suit in this Court on the basis of the Eleventh Amendment, nor under

6   California Government Code § 815.  The several Cross-Claims for relief are

7   adequately stated.  The motion to dismiss is denied in its entirety.

8

9   DATED:  April 12, 2016

10

11                                            Hon. Roger T. Benitez
                                              United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28