1              United States District Court

 2          For the Southern District of California

 3
                                    )
 4   THE REGENTS OF THE UNIVERSITY OF )
     CALIFORNIA, a California          )   No. 15-CV-1766-BEN-JLB
 5   Corporation,                      )
                                       )   January 5, 2017
 6        Plaintiff,                    )
                                       )   San Diego, California
 7           v.                         )
                                       )
 8   PAUL S. AISEN, etc., et al.,       )
                                       )
 9        Defendants.

10

11              Transcript of Motion Hearing
            BEFORE THE HONORABLE JILL L. BURKHARDT
12               United States Magistrate Judge

13   APPEARANCES:

14   For the Plaintiff:     CROWELL MORING
                            MARK A. ROMEO
15                          DANIEL M. GLASSMAN
                            3 Park Plaza, 20th Floor
16                          Irvine, CA  92614

17   For the Defendants:    QUINN EMANUEL
                            MICHAEL ERNEST WILLIAMS
18                          AMAR THAKUR
                            865 S. Figueroa St., 10th Floor
19                          Los Angeles, CA  90017

20

21

22
     Court Reporter:        Dana Peabody, RDR, CRR
23                          District Court Clerk's Office
                            333 West Broadway, Suite 420
24                          San Diego, California, 92101
                            DanaPeabodyCSR@gmail.com
25

San Diego, California, January 5, 2017

*   *   *

THE CLERK:  Calling matter number 8 on calendar,

15-CV-1766-BEN-JLB, the Regents of the University of California

Versus Aisen, et al., set for motion hearing.

THE COURT:  Could you state your appearances for the

record, please.

MR. ROMEO:  Good morning, Your Honor.  This is Mark

Romeo on behalf of the Regents, and to my right is Dan

Glassman, my colleague, also represented the Regents.

MR. WILLIAMS:  Good morning, Your Honor.  Michael

Williams on behalf of defendants.

MR. THAKUR:  Amar Thakur on behalf of the defendants.

THE COURT:  Welcome, everybody.  Let me give you some

thoughts that I have, and then I'll hear from you.

Having reviewed and considered the papers submitted, I

am inclined to appreciate the plaintiff's need to do a forensic

evaluation of at least some of the devices that they've

inquired -- that they have sought to analyze.

And I would like to -- but I'm happy to discuss with

USC their arguments for why none of the devices should be

inspected.

With respect to the extent of the inquiry, I would

like to address today the breadth of the request with respect

to which devices are analyzed.  I'm not particularly concerned

1    about the time period, though I'd hear from USC on that as

2    well.

3         I am concerned that the request is overbroad to the

4    extent it seeks to analyze all devices used for any

11:04    5    communications between any of the defendants.

6         I'm less concerned about the request for analysis of

7    the devices which were used to copy, transfer, store, or

8    communicate data or documents over which UCSD had custody and

9    control, and I would like to hear from USC with that

11:04   10    modification how many devices we would be talking about.

11         I'd like to talk about the cost and what the

12    plaintiff's position is with respect to who should bear the

13    cost beyond the initial burden and cost of the forensic

14    examination, and I would like to hear from USC with respect to

11:04   15    whether they feel there needs to be any modifications to the

16    protocol that was developed with respect to Dr. Aisen's devices

17    for the devices at issue here.

18         I understand that when that agreement was negotiated,

19    it was specifically carved out, that was without prejudice to

11:05   20    USC's position that it was only applicable to Dr. Aisen's

21    devices, but what you didn't address was the -- whether there

22    were any substantive issues with it assuming that further

23    forensic analysis is authorized.

24         So those are sort of my thoughts, and I offer it up to

11:05   25    give you guidance.

1          The other thing I would like addressed is assuming

2    that some of these devices are subject to forensic analysis,

3    what is the limitation on what the plaintiff is seeking and

4    what would be provided to them to come out of the forensic

11:05   5    analysis.

6          So I am going to hear first from the moving party,

7    first from -- well, the proponents of the discovery, so I'll

8    hear first from the plaintiffs.

9          MR. ROMEO:  Okay.  Good morning, Your Honor.  Mark

11:06   10   Romeo on behalf of the Regents, and I'll try not to speak

11   directly into this, but I appreciate your comments, and let me

12   address just a few other things.

13          Let me start from one question that I have is the

14   University of California does not understand exactly how many

11:06   15   devices there are.  I am told that USC's expert on forensics, a

16   fellow by the name of Mr. Kunkel, has produced an exhibit I

17   have not seen yet that has a listing of certain external

18   devices, like thumb drives, hard drives, and those kinds of

19   things.

11:06   20          I know based on the depo testimony that we took of

21   Ms. Tobias, Mr. Pizzola, Ms. Shaffer, I can identify certain

22   devices, but not by serial number that they took, at least the

23   ones they admitted to taking in deposition, but I think I'm

24   going to need to hear from at least perhaps USC's counsel and

11:07   25   compare to to Mr. Kunkel's report exactly what the number is

1    because I cannot speak to that, so I have anecdotal evidence by

2    virtue of admissions in deposition testimony.  I wanted to

3    start there.

4              Number two is the UC has agreed to bear the burden of

11:07    5    the forensic examination.  USC has raised an issue of privacy,

6    as they articulated in their papers, but, for example, as we

7    said in our response, there's no foundation to the suggestion

8    that there is, unlike the Aisen device, which was a UC laptop

9    that he used for his business from, I think, 2015 all the way

11:08   10    through termination, his mobile phone, and his USB drive that

11    he might have used in the normal course of business.  Here the

12    witnesses have testified -- and I have excerpts, additional

13    excerpts, to provide to the Court that show that these

14    particular devices, the many of them that we're interested in,

11:08   15    were purchased with the specific intent to download UC

16    information and take it to USC.

17              For example, Elizabeth Shaffer, she is one of the

18    named defendants, and she was in charge of what they call the

19    regulatory aspect of the ADCS, so when the studies come in to

11:08   20    these research universities, like USC or UCSD, they have to

21    have regulatory approval from what are called Internal Review

22    Boards, and there's study protocols that have taken months, if

23    not years, to develop by the university.  They show who the

24    patients are, the proposed extent of the study.  All of those

11:09   25    things are backed up on what are called regulatory drives, and

1    they are backed up to what's called a regulatory drive at UCSD.

2         Ms. Shaffer testified that she doesn't remember when

3    because she didn't -- she had a lot of "I don't knows" in

4    deposition.  I think it was to protect herself from liability,

11:09    5    but she said she believes it was in 2015 that she went to

6    Best Buy to purchase an external drive, and she said that she

7    used it to back up our hard drive at work, our server drive at

8    work, and this is on page 57 to page 58 of her deposition, and

9    I later had her explain what exactly it was.

11:09   10         I believe it was one external hard drive, and that was

11    used to back up the contents of the ADCS regulatory drive and

12    her personal drive, and she later admitted that was inserted

13    into a USC device.  She doesn't say whether she transmitted any

14    data, but she admits on page 64 of her deposition and 65 that

11:10   15    it was inserted into a USC computer after she left.

16         So it's a little bit of a jumbled way to say on the

17    question of the protocol, the way it will look, as different

18    from the Aisen device protocol, most of the devices, we

19    understand in question, were used solely for the purpose to

11:10   20    back up UCSD information and take it to USC.

21         THE COURT:  Accepting that some of the devices that

22    you seek to forensically evaluate were dedicated devices --

23         MR. ROMEO:  Yes.

24         THE COURT:  -- presumably your request goes to other

11:10   25    devices.  What comes to mind is possibly cell phones that on

    1   which some of the data may have been communicated or

    2   transferred that would also have been used as a personal

    3   device, so I think we need to assume that if we're -- with

    4   respect to some of the devices, there are going to be issues of

11:11   5   confidentiality and nonresponsive information.

    6           MR. ROMEO:  Yes, and I would certainly agree with you

    7   with that.  I can address your comment about trying to excerpt

    8   from the protocol certain devices that were -- or I think

    9   certain electronic communications between the individual

11:11   10   defendants, but I would tend to agree with you that there might

    11   be those kinds of devices in addition to the ones that were

    12   specifically purchased for the sole intent to take our

    13   information and take it to USC, and perhaps -- like some of the

    14   courts have done in other cases, we can go back and formulate a

11:11   15   protocol not on the fly, but give it some thought and then

    16   present it to you, but there might be an exception, so those

    17   kind of devices and how we treat those to prevent like a

    18   wholesale, for example, disclosure of personal information to

    19   the extent it exists, it may be requiring USC to lay some

11:12   20   foundation there is personal data because we don't know.

    21           What we know is devices -- for example, I was going to

    22   give you one other example, and then I can be quiet on that.

    23           Ms. Tobias testified in deposition and Mr. Zhao, who's

    24   a current UCSD employee, who ultimately did not go to USC, but

11:12   25   I think was intending to go to USC, she directed Mr. Zhao to

```
        1    back up what's called the CTMS.  You probably heard about that
        2    computer system.  It's called the Clinical Trial Management
        3    System at UCSD, and this is proprietary software not that you
        4    purchase at a Computer World or wherever you purchase computer
11:12   5    software these days, but it was something that he and other
        6    developers developed especially for this ADCS program, and
        7    Ms. Tobias directed Mr. Zhao to go out to Best Buy or wherever,
        8    Fry's or Best Buy -- he actually went to Best Buy -- he
        9    purchased at least four external hard drives, and these are the
11:13   10   big Toshiba kind of hard drives, not just the little thumb
        11   drives that you put into your personal computer, and he
        12   downloaded 4.5 terabytes of information, including the
        13   entire -- as he testified, the entirety of the CTMS computer
        14   system, and it may not have included the source code.  He's not
11:13   15   sure, but it was 4.5 terabytes, and when I did a quick Google
        16   search --
        17               THE COURT:  You addressed that in your brief.
        18               MR. ROMEO:  But the important thing is, again, that
        19   device was specifically purchased for the -- to download UCSD
11:13   20   information and take it with him, and Ms. Tobias later
        21   testified that she submitted reimbursements to USC to
        22   compensate her for the purchase of the device, and USC paid her
        23   in terms of a bonus after she got to USC, and Mr. Zhao
        24   testified -- and I haven't provided this to the Court, but I
11:13   25   certainly can do that, because I took his deposition -- that
```

1    Ms. Tobias, after he came back from Best Buy and they
2    downloaded the information, she gave him five $100 bills for
3    the reimbursement for that particular device.

4              So it's a long way of saying that we can except out
5    probably certain devices, but certain devices, such as the
6    devices that we know were used solely for the purpose of UCSD
7    information, we might not want to subject those to the same
8    more extensive scrutiny, so I think that's one way of
9    addressing one.

10             THE COURT:  You wouldn't want to subject them to the
11   same more extensive scrutiny, so I'm not sure what you're
12   suggesting with that.

13             MR. ROMEO:  Well, I don't believe there's any personal
14   data on there.  I think it's only UCSD data that existed on
15   there because they were purchased for the sole intent to back
16   those things up as demonstrated by the deposition testimony I
17   cited to.

18             And if I may, I can substitute or supplement our
19   showings with the Zhao testimony and perhaps some more of the
20   Tobias testimony.

21             THE COURT:  Okay.  So I think what you're suggesting
22   is that there be sort of two tiers of devices and that only
23   those devices for which there is some information provided by
24   USC that there is reason to believe that there would be private
25   information on them would be subject to a review beyond the

1  forensic analysis and the data being turned over by an

2  independent third party.

3          MR. ROMEO:  That's --

4          THE COURT:  Is that --

11:15   5          MR. ROMEO:  That is correct.  That seems to me

6  reasonable given the facts of this case.  It's a very unique

7  case, as we talked about.  It's nothing -- I've never seen

8  anything like it in 23 years of doing a lot of this unfair

9  competition kind of disputes, never seen anything like it, so I

11:15   10  think it would make sense in this kind of case.

11          You also asked the question about the extent of the

12  inquiry, so I'm prepared to address that.

13          So we have -- obviously you saw Penal Code 502(c)

14  mentioned quite a bit, so we're going to be required to prove

11:16   15  at trial when certain data, computer systems, were accessed,

16  when it was transferred, did USC make use of those things, and

17  those are going to be proven, we believe, in part by the

18  devices themselves in the metadata that exists on those

19  devices, and if they deleted things, even though USC, I think,

11:16   20  conveniently argues that well, like Dr. Aisen when he deleted

21  the 5400 files on his UCSD computer the night of his deposition

22  in this case, on July 15th, that oh, well, that was found by

23  the forensic -- the special master, the independent special

24  master appointed by the Court, it was still recoverable from

11:16   25  another source.  Penal Code 502(c) doesn't recognize a

justification kind of defense for that.  The fact that he
deleted that information and it concerned UCSD, it was UCSD's
information, we believe that establishes an independent
violation, so the deletion activity will be important to
understand.

Also in terms of the other attendant tort claims, duty
of loyalty, breach of fiduciary duty, and USC aiding and
abetting in the breach of those claims, when they downloaded
things is very important.

For example, if you download -- we know they did.  So
I'll just use one case in point.

On 5-23-2015 when Tobias tells Mr. Zhao to back up the
CTMS on these hard drives he purchased from Best Buy, she
admitted she was employed by UCSD.  Mr. Zhao was employed by
UCSD.  And you'll see, and I think it's Exhibit -- sorry.
Exhibit G -- sorry.  Give me a second.  Exhibit H to our
motion.  On 5-26-2015 USC's Rene Pak, who is -- she's the
director -- I'll represent she's the director of operations at
the Keck School of Medicine where these folks all ultimately
went to become employed after leaving UCSD, but she tells Ted
Budge, who is the -- I think he's an operational -- I think
he's been described as the COO of the Keck School of Medicine,
and Tom Buchanan, who is the vice dean of research at UCSD Keck
School of Medicine, and Janet Stoekert, who is a regulatory
person there, she says that -- or she said in an email, which

1   is Exhibit H to our motion, page 81, that the group has

2   incurred some expenses over the weekend, approximately $5,000

3   on personal credit cards to purchase external hard drives, cell

4   phones, et cetera.  And then she says, "Ted, who should I work

11:19   5   with to set up an account to reimburse their expenses?"

6           So the timing of in terms of what we want to recover

7   from devices, the timing of when they did these things will

8   establish, we believe, USC aiding and abetting the breach of

9   duty of loyalty, aiding and abetting breach of fiduciary duty,

11:19   10   and USC's own obligations under 502(c) which Judge Benitez left

11   standing in tact because USC is obviously not a monolith that

12   acts through people like you and me.  Not you and me, but

13   through its employees, and perhaps in this case, soon to be

14   employees, those who had already switched their loyalties to

11:19   15   USC from UCSD.

16           So we're going to want to know when they did it, USC's

17   knowledge of it, which should be recovered hopefully from

18   metadata, probably from the data itself, and how it was then

19   used at USC.  Was it plugged into the computers that

11:19   20   Ms. Shaffer, for example, testified she had done?

21           THE COURT:  I understand all of that, and my question

22   is what direction do you anticipate providing the forensic

23   analyst as to what they're looking for?  Clearly they're going

24   to receive some direction.  I mean all your discovery request

11:20   25   is is, you know, give us access to forensically analyze these

1    documents.  It doesn't say what you're analyzing it for or what

2    information you're going to retrieve from it as a result of the

3    analysis.

4            And so, for example, is your analyst going to be

11:20    5    limited to searching for documents and metadata associated with

6    documents over which UCSD had or previously had custody and

7    control or -- and often directives to forensic analysis will

8    also include additional metadata information that points to the

9    identity or is evidence of the identity of the person engaged

11:21    10    in the computer activity.

11            What am I approving if I approve the forensic

12    analysis?

13            MR. ROMEO:  I think that's a fair, you know -- you

14    know, I'm not going to probably represent verbatim what a

11:21    15    proposed protocol would look like, but I would imagine that we

16    would want to see what the data was, and I would imagine

17    we -- as we said in the revised request when we tried to

18    negotiate with USC's lawyers about the scope of the request, we

19    limited it to information between 12 -- or devices used between

11:21    20    12-14 -- 12-2014 to July 31, 2015, which was used to copy,

21    transmit, store, or communicate documents stored electronically

22    or to communicate with any -- between any individual defendants

23    and defendants USC and study sites that existed on UCSD's

24    computer systems.

11:22    25            So I think we want to see what the subject

14

1   matter -- what the title of the document might be, who it was
2   sent from and to, when it was taken, was it deleted, those
3   kinds of things, but really trying to limit it to the
4   information that resided on UCSD's computer systems and not
11:22   5   going beyond that.

6           Obviously if they have done something like -- on the
7   fly, I'm not sure I -- I can articulate it as well as I
8   probably should, but if they've done something with it at USC,
9   but the data originated at UCSD on its systems, we probably
11:22   10  should be able to see that because I think it would go to the
11  make use of the information by USC, which is independent
12  violation of Penal Code 502(c), so I'd imagine that, if I
13  answered your question.

14          THE COURT:  You did at least generally.
11:23   15          MR. ROMEO:  Okay.

16          THE COURT:  All right.  I'm disinclined, as I
17  indicated, to order the examination of devices that fall
18  outside the category of those used to copy, store, transfer,
19  communicate data or documents over which UCSD had custody and
11:23   20  control; that is to say, carving out those devices which would
21  only fall into your request by virtue of the fact that they
22  were used to communicate with others, either other defendants
23  or study sites, et cetera, et cetera.

24          Do you want to be heard on that?
11:23   25          MR. ROMEO:  So if I understand what you're saying,

1    you're saying that to the extent a document originated --

2        THE COURT:  No, we're talking about the device.  We're

3    not talking about the scope of the search now.  We're talking

4    about which devices are subject to analysis.

11:24    5    MR. ROMEO:  Yeah, I think that's -- I think that's

6    fine as an initial matter, but as I understand it, and, again,

7    just history and experience has taught me this, that the

8    particular device, you can transfer information between

9    devices, and to the extent we want to trace where information

11:24    10   went from one device to another that the order would

11   accommodate that ability to trace.

12        I'm not sure if that runs afoul of your initial

13   thinking, but that's what I'd want to make clear.  And

14   if -- are you saying that if they used the mobile phone to

11:24    15   communicate about UCSD, we shouldn't be entitled to that?

16        THE COURT:  No, you have defined the universe of

17   devices in two ways.  I'm comfortable with the device that fall

18   within the first component of your definition.  Those devices

19   which were used to copy, transfer, store, or communicate data

11:25    20   or documents over which UCSD had custody and control.  Some of

21   those devices will also most certainly be devices that were

22   used to communicate.

23        The second clause, the absence of the second clause,

24   is not going to remove any documents that would otherwise fall

11:25    25   into that first universe.

1          MR. ROMEO:  Okay.

2          THE COURT:  What I'm saying is devices that don't fall

3  into that universe, devices that would only be captured by the

4  second clause; that is to say, devices that were used to

11:25    5  communicate with any defendant study sites or study sponsors,

6  it's my position at this time that is overbroad to the extent

7  you're reaching to those devices.

8          MR. ROMEO:  Okay.  I got that.  So thank you for that

9  clarity.

11:25  10          So I would simply say the way it works in this

11  environment, and part of our claims is the interference with

12  the contractual arrangements, there's been blatant admissions,

13  in fact, by Tom Buchanan, the vice dean of research, just a

14  week and a half ago when Mr. Williams and I were in my LA

11:26  15  office taking his deposition, that USC was aware of the

16  contractual arrangements between UCSD and the study sponsors,

17  like Toyama Chemical, Eli Lilly, and those kinds of things.

18          And there's admissions by Jeremy Pizzola, Deborah

19  Tobias that they were soliciting -- not just soliciting, but

11:26  20  they were actually telling Toyama Chemical to terminate their

21  contract with UCSD and bring it over to USC, and when Toyama

22  Chemical pushed back and said well, let's talk to UCSD's

23  lawyers, I don't feel comfortable, they said oh, you don't need

24  to do that.  Don't worry about it.

11:26  25          THE COURT:  Let me interrupt you to refocus you.

1       MR. ROMEO:  Yes.

2          THE COURT:  All right.  I'm not questioning that

3    there's -- that there could be relevant documents on those

4    devices, and presumably you've propounded discovery to get to

11:27   5    those emails.  The issue is not whether you get that discovery.

6    The issue is whether you get to do a forensic analysis of those

7    devices.

8          Ordinarily in discovery, you propound discovery, you

9    ask for certain documents or data, and you rely on the other

11:27   10   side to provide it to you.  It is not in the ordinary course

11   that you yourself go into those devices and do a forensic

12   analysis.

13         I'm persuaded that with respect to that first category

14   of devices under the facts and law of this case, at issue in

11:27   15   this case, it makes sense to subject those devices to a

16   forensic analysis because you're not asking for the documents

17   and the data.  You're asking for an analysis of the metadata

18   that shows such things as who had access, time of access, every

19   time it was transferred, et cetera, et cetera.

11:27   20         With respect to straightforward communications between

21   two people, nothing in your brief has addressed the need that I

22   recognize -- has addressed or sufficiently addressed the need

23   for you to actually do a forensic exam with respect to mere

24   communications between people.

11:28   25         I'm not persuaded that the ordinary method of

1   discovery, asking for the documentation and relying on the

2   other side to provide it to you, is inadequate with respect to

3   that component of the discovery in this case.

4        MR. ROMEO:  Yeah, I guess I'm arguing in part in the

11:28   5   dark here because I don't know exactly what they did with those

6   devices, so I know that a lot of folks have testified -- we put

7   some of it in our papers -- that there was a systematic -- I

8   think it's called a -- pretty much can be properly

9   characterized as a systematic effort to delete files, and

11:28   10  because the deletion of files, even text messages in this case,

11  to the extent it concerned UCSD, concerned the nefarious

12  activities, if it was meant to delete data, for example,

13  communications between the defendants and the study sponsors,

14  transmitting -- what they did here is they transmitted all of

11:29   15  UCSD's contracts so they could simply take over the UCSD

16  templates when they got to USC and sign them up very quickly.

17  To the extent those devices contain metadata that would show

18  that and to the extent that --

19        THE COURT:  Metadata that would show what, the

11:29   20  transfer or deletion of data?

21        MR. ROMEO:  Correct, the transfer.

22        THE COURT:  Well, then it would fall into the first

23  universe of documents.

24        MR. ROMEO:  Well, I think that --

11:29   25        THE COURT:  If the device ever had those materials on

1   them, even if they were subsequently deleted, that's going to

2   fall into your first universe of devices that you have asked to

3   forensically analyze.

4       What you're going to lose is, you know, somebody's

5   phone that never had any of the data that formerly was under

6   the control of the Regents, but nonetheless was used to

7   communicate with other individuals on the subject -- even

8   possibly on this -- on subjects that go to the issues of this

9   litigation, but if the data never resided there, ever then,

10  you're not going to get that device under my tentative.

11      So do you have anything more you'd like to say on why

12  you should get to those devices that never had this data on

13  them?

14      MR. ROMEO:  Well, if the device never had the data,

15  and to your point about the rules usually don't contemplate

16  certain imaging activities in a normal case, and it seems to me

17  not to be problematic to us, but I sure don't want to make a,

18  you know, clear-cut yes, I agree --

19      THE COURT:  No, no, and I don't need you to.  I just

20  wanted to give you the opportunity if you had an argument to

21  make to me that would be more persuasive to me, I wanted to

22  give you an opportunity to make it.  You're not conceding

23  anything or, you know, waiving anything.

24      MR. ROMEO:  Yeah, and I just honestly am now thinking

25  of it.  I think it's a good issue you raised.  So subject to

1   your caveats, it sounds like that is something perhaps we would

2   be willing to break out, but I just want -- here in court --

3          THE COURT:  You're not conceding anything.  You're

4   merely contributing to the decision-making.

11:31   5          MR. ROMEO:  So thank you for that.

6          So I think that is something that we will consider.

7          And I would imagine, just in terms of the logistics,

8   that we would negotiate with USC's counsel just as we did

9   before with Dr. Aisen's UCSD computer, Dr. Aisen's

11:32   10   UCSD-provided mobile phone, and the one Aisen USB device, we

11   would negotiate a protocol and submit it to you for approval.

12          The one thing I will ask given that time is

13   short -- well, we don't have a trial date, but I think motion

14   practice and things like that is coming up.  I think it's at

11:32   15   the end of this month.  If you might put us on a little bit of

16   a shorter leash to come up with a protocol.  We have obviously

17   enough lawyers just in this room to do it pretty quickly, so if

18   you could do that, that would be helpful.

19          And let me address one other thing which is I think

11:32   20   the costs in terms of the -- who would bear the burden of this

21   forensic exam.

22          My suspicion is that it would be agreeable to UCSD and

23   may also be agreeable to USC that we would use the same special

24   master, and we would just have perhaps an amendment to his

11:33   25   charge to do this forensic examination.  If there's, I guess,

1   any reason why the parties wouldn't be inclined to use the

2   special master, Stroz Friedberg --

3           THE COURT:  Then we'll hear about it in a moment.

4           MR. ROMEO:  We would consider it.  And I believe, as

11:33   5   we said in our papers, we will bear the cost of Stroz Friedberg

6   to do the inquiries that we want him to do.

7           THE COURT:  And the concern, as I understand it, and

8   we'll hear about that in a moment, the concern of USC, as I

9   understand it, is once that analysis is done, at least with

11:33   10   respect to devices that were put to multiple purposes, there's

11   a whole second level of analysis that they contemplate which

12   can become very expensive, and that's the cost they're focused

13   on.

14           MR. ROMEO:  Yeah, and I guess there's not a lot of

11:34   15   foundation here that I saw, and I understand that the Court

16   limited both sides to a limited number of pages to brief and

17   set forth the issues, so I'm not going to hold USC to making

18   sure they articulate every single thing in the papers, but I

19   don't think that there's a lot of foundation for that, and I

11:34   20   guess I want to hear from Stroz Friedberg.  We have a fairly

21   open line, as you probably know, with James Aquilina and his

22   colleague, so see what kind of other things that might be

23   contemplated given these stated concerns of USC to the extent

24   there is foundation for those concerns.

11:34   25           THE COURT:  Okay.

```
 1          MR. ROMEO:  I don't think you had an issue with the
 2   date proposed, the date modifications --
 3          THE COURT:  I didn't, and I don't think that was a
 4   real strong -- I don't think that USC argued strongly in
 5   opposition, but we'll hear from them in a moment.
 6          MR. ROMEO:  So the one thing that I guess I'll ask you
 7   is did I not answer any of your questions?
 8          THE COURT:  No, this is good for now.  I may turn to
 9   you again after I hear from them.
10          MR. ROMEO:  Okay.  Thank you, very kindly.
11          MR. WILLIAMS:  Thank you, Your Honor.
12          I think Mr. Romeo summed it up best when he said he's
13   arguing in the dark.  That's the difficulty with this request
14   in trying to identify what it is that they're actually looking
15   for because they don't know.  They're speculating that there's
16   something out there and hoping to find some smoking gun, but
17   those are the exact type of situations where courts have
18   refused this type of intrusive analysis.
19          The cases, even the ones that they cite, say it's
20   insufficient to allow a forensic inspection when it's based
21   upon skepticism or some inkling that the other side didn't
22   comply with their discovery obligations.
23          They have not raised any issue with our responses.  We
24   spent quite a long time negotiating the discovery plan in this
25   case.  We agreed ultimately after initial objections to provide
```

11:35

11:35

11:35

11:35

11:36

1   all of the metadata fields that UCSD requested.  Those are

2   spelled out in the joint discovery plan.  They ask for all

3   sorts of metadata that we felt was over and above the needs of

4   this case, but we ultimately agreed to that.

11:36   5   We have spent millions of dollars collecting devices

6   through a forensic consultant, analyzing those, reviewing

7   those, and producing hundreds of thousands of documents in this

8   case so far over this entire time in response to their

9   discovery requests.

11:36   10   Every time they did a request, we had a meet and

11   confer, we agreed to narrow the scope of particular categories,

12   we agreed to okay, well, these are overbroad, so we'll agree to

13   search for documents related to these different topics.  The

14   parties engaged in that process on both sides.

11:37   15   We worked with a specified list of custodians, we

16   worked on agreed upon date ranges, and there's no dispute about

17   that.  We have done that, and now discovery closed last week,

18   and by this motion, they're attempting to come back -- and we

19   provided all the metadata that they asked us to provide, and

11:37   20   now --

21   THE COURT:  What do you mean when you say you provided

22   all the metadata that they asked you to provide?

23   MR. WILLIAMS:  So in the proposed discovery plan which

24   this Court signed off on, there was -- we had to agree on a

11:37   25   discovery plan, and part of that was the ESI protocol.  And the

24

1    pages -- it starts at page 28 under "Metadata Fields Chart."

2    It goes through and identifies all the different categories of

3    metadata, and, in fact, there was a prior version that was

4    lodged with the Court.

11:38   5         If you recall, when we first had the scheduling

6    conference, it wasn't a full blown one because Judge Benitez

7    hadn't ruled on the motions to dismiss yet, but we put in a

8    proposed discovery plan, and then there was a -- we were going

9    to wait to have the full blown scheduling conference until he

11:38  10   ruled on the motions to dismiss.  There was a debate over

11   certain fields of metadata that would be provided we believed

12   was over and above what was necessary.

13        Ultimately rather than raise a dispute with

14   Your Honor, we decided we would just provide those additional

11:38  15   fields of metadata.  And if you -- it's all described.  I mean

16   this was the protocol that they asked for in terms of what

17   information, what metadata specifically would be provided, and

18   if you'd like, Your Honor, I can hand up a copy of it if you'd

19   like to take a look at it.  And so if you'd turn to the bottom

11:39  20   of page 28, that's where it starts.

21        MR. ROMEO:  Do you have a copy for me?

22        MR. WILLIAMS:  So in addition to the normal Bates

23   numbers, authors, custodian, to, from, there are date received,

24   time received, email folder path, creation date, creation time,

11:40  25   last modified date, last modified time, last access date, last

```
         1   access time, redacted, the file name, the file type, the file

         2   size, page count, processing time zone, and, importantly,

         3   folder path, which is where the documents were stored, message

         4   ID, email thread, family ID, so it would show if it was sent

11:40    5   along, and the hash, which is a secure algorithm to determine

         6   that it's an original file, and, again, these are the metadata

         7   fields that UCSD requested we provide, which we did.

         8           So we've spent the last --

         9           THE COURT:  So you provided this metadata with respect

11:41   10   to what?

        11           MR. WILLIAMS:  To all of the documents that we have

        12   produced in response to their request, which have included a

        13   review of all of the devices that we went out and we did what

        14   we're obligated to do.  We do a custodian interview.  What are

11:41   15   the devices that you would use that may fall into these

        16   categories?  We forensically imaged the custodian's devices, we

        17   processed that, we spent literally millions of dollars

        18   reviewing all of that data to provide responsive

        19   non-privileged, relevant documents in response to their

11:41   20   request, including the metadata associated with that.

        21           THE COURT:  And then what about documents that are no

        22   longer in existence?

        23           MR. WILLIAMS:  Well, we don't -- I mean if we don't

        24   have them, we can't produce them, but we don't -- they have not

11:41   25   identified any relevant documents that have been deleted, and
```

1  that's something I want to address because it's a bit of, I

2  think, misinformation.

3  So they talk about Dr. Aisen's deletion of Dropbox

4  files, and this is a perfect example.  This is what -- we have

11:42  5  already been through this examination.  Dr. Aisen provided his

6  laptop, his USB device, his cell phone.  We went through the

7  protocol, and at first it was saying that on his laptop there

8  was 5,400 files from his Dropbox folder.  This was not a UCSD

9  account, it was his personal Dropbox account.  They tried to

11:42  10  make an issue of it.  We came back.  We said look, they're in

11  his actual Dropbox account.  They're still there.  It's just it

12  wasn't on the local copy of his laptop.  We went through a

13  whole 'nother process.  We provided the special master with

14  access to his actual Dropbox account because if -- Your Honor,

11:42  15  you can delete a local copy somewhere, but you still have your

16  account for Dropbox, and it's in the cloud.  He went through

17  it, he confirmed that all of the files were there except for

18  four files which based on the deletion date years before any of

19  the issues in this case and the file name, counsel, Mr. Romeo,

11:43  20  sent in an email saying I agree, those four files don't look

21  interesting.  So there is no issue about deletion of data.

22  They've tried to create this whole thing about, you

23  know, people went out and wiped.  Well, people wiped -- certain

24  informatics people wiped their laptops before turning them back

11:43  25  in, which was their practice at UCSD because those laptops

1   contained personal health information and other sensitive
2   information related to these clinical studies.

3          Their own forensic expert said that that would be an
4   excellent protocol to engage in in terms of when you have a
5   laptop that has sensitive information, you know it's going to
6   be recycled, you wipe it.

7          Now, Yunde Zhao, who they referred to who's the one
8   who made these backups -- and I want to address that
9   momentarily.  He said UCSD IT was not very good about wiping
10  laptops once they were turned in, and they would get
11  redistributed still having sensitive information on them.

12         So this idea -- and not only that, but
13  Mr. Jimenez-Maggiora, yes, he wiped his laptop, but he left a
14  complete backup hard drive sitting on his desk for UCSD, which
15  they have, so that there's all the material that was there,
16  every -- all of the emails, they were all in the UCSD server.
17  They have those.

18         This is not a trade secret case.  It's not a theft of
19  intellectual property case.  These are clinical drug studies
20  that are regulated by the federal government.  It's research
21  data.  You don't just steal data in the middle of a clinical
22  study and run off to Russia and sell it.  I mean these are
23  ongoing studies.

24         The reason these things were backed up -- and Mr. Zhao
25  said the same thing.  He never -- he didn't come to USC.  He

11:43 (line 5)
11:44 (line 10)
11:44 (line 15)
11:44 (line 20)
11:45 (line 25)

1    backed up the CTMS because emails from UCSD administrators said

2    that they were coming after and trying to physically disable

3    the ADCS servers after they had already locked Dr. Aisen out of

4    his electronic access to manage the studies.  They were trying

11:45    5    to physically disable the servers.

6    THE COURT:  Can I interrupt you because this is to

7    me -- this is not about whether the actions were justified or

8    not justified, whether they were right or wrong.  That's for a

9    merits determination by a judge who has life tenure.  I get to

11:45    10    decide the discovery dispute.  The issue to me is it's not

11    whether it was right or wrong.  It's whether the -- whether the

12    Regents are appropriately propounding discovery calculated to

13    recreate the path of those documents.  So if you provide

14    documents, you provided metadata with respect to whatever

11:46    15    device you retrieved it from, it seems to me that that does not

16    give the Regents a complete history of that document, if it was

17    on previous devices on which it no longer resides.  So you

18    provide one -- it would be nice if I had an example, but I

19    don't, so you provide a document which let's say currently it's

11:46    20    in Dropbox or currently it's on USC's hard drive -- on their

21    server.  If it was previously on a hard drive which maybe no

22    longer has those documents on it because they were transferred

23    off, okay, let's say they were downloaded onto a hard drive and

24    from the hard drive they went to USC's servers.  Without an

11:47    25    examination of that hard drive, right, which no longer has the

1    documents on it, but which has the history of the documents,

2    right, having been on them, unless it was wiped, I understand

3    depending on how it was wiped, there may be nothing there, but

4    if it was -- if the data was transferred off and then deleted,

11:47    5    that history of that document's existence on that hard drive is

6    still going to exist.

7             MR. WILLIAMS:  But, Your Honor, they have -- and I

8    agree with you not to argue the merits.  All that is is

9    speculation.  The only laptops that they know of that were

11:47    10   wiped have been turned back in to UCSD, and their forensic

11   expert has already analyzed them.

12             THE COURT:  But they're not speculating the documents

13   and data were removed and transferred via a number of different

14   media.  They have hard evidence of that.

11:48    15             MR. WILLIAMS:  And they also have copies of that.

16   Those 4.5 terabytes of those hard drives that were backed up,

17   we produced those.  We produced forensic images of those, and

18   what did they do?  They came back and complained and said you

19   just dumped 4.5 terabytes of data.  You said you wanted

11:48    20   everything that was copied.  There was a flash drive that

21   Ms. Tobias backed up with her emails and other work

22   information.  We produced a forensic image of that flash drive.

23   They've asked us questions.  What information and documents

24   have been taken from UCSD?  We've given them that list, and

11:48    25   we've produced those documents.  That's the way discovery

1   works.  You don't then get to come in and say well, I don't

2   believe you.  There might be something else, so I think we

3   should be able to forensically image all of these devices to

4   find something that we don't even know what we're looking for.

5   They have all --

6           THE COURT:  What's the universe of devices we're

7   talking about subject to the limitation that I proposed?

8           MR. WILLIAMS:  Well, there are 45 devices at issue.

9   Subject to your limitation I -- I'm not exactly clear.  That's

10  something I wanted to get some clarification on because it

11  would sound like if a device was used to back up information

12  from UCSD -- well, let me start.  The only things -- the only

13  devices that I'm aware of that have had any kind of wiping were

14  laptops before being turned back in to UCSD.  So they have that

15  information.

16          With regard to devices to copy, we have the 4.5

17  terabytes which were saved on four or five hard drives, which

18  they have a forensically imaged copy of, they have flash drives

19  that were used to back up information, and, you know, there

20  were other documents which we identified like regulatory

21  documents and stuff, but, again, these aren't -- this isn't

22  information that was taken from UCSD.  These were copies that

23  were backed up, and, again, we can get into the -- that's for

24  the merits as to why they were backed up and whether it was

25  justified, but they haven't identified information or documents

1    that it was -- that was removed from them other than there

2    were, I think, a couple of hard copy regulatory files that

3    Ms. Shaffer sent back to Eli Lilly, the sponsor, and then Eli

4    Lilly sent them back to UCSD.  So they had copies, but there

11:50   5    aren't -- I'm not aware of any other information.

6            So this is just a complete fishing expedition to say

7    we didn't like everything you produced in discovery so we want

8    to see if there's something else out there.

9            So I don't know how to -- I mean I guess with your

11:51   10   limitation, Your Honor, you know, if someone has access to -- I

11   mean, what is it the data -- you said well, if it was data that

12   was under the custody and control of UCSD.  The question is

13   what does that include?  I mean, if an email was sent and

14   that -- an individual also has access to their email on their

11:51   15   cell phone, does all of the sudden that bring the cell phone

16   into it?  I just don't know where you parse that out, and if

17   you can access your email on a new phone you get that had

18   nothing to do with your time at UCSD, you know, where does that

19   begin?  And where does it end, I should say.

11:51   20           And so that's where all of this really comes back to.

21   You have to identify some discrepancy.  You have to say we knew

22   this existed, and you haven't produced it, so we're entitled to

23   come find it.

24           THE COURT:  I think that's a different basis than the

11:52   25   Regents were relying on.  My understanding is not that they're

1   saying we know email access exists.  We requested it in

2   discovery.  It was not produced.  We, therefore, believe that

3   they're hiding discovery, and we need to go to the source.

4   That's not this argument.

11:52   5        This argument is based on the allegations of our

6   complaint, relevant evidence includes the metadata which will

7   establish the path of certain documents and data from its

8   origin at UCSD to its ultimate resting place and sufficient

9   information from the metadata to disclose not only the timing

11:52   10   but the participants involved.

11        So it's not a matter of saying we asked for document X

12   and you didn't give it to us.  I think you gave them the

13   document.  And you gave them the metadata that is attached to

14   the document with respect to its final place of residence, but

11:53   15   it seems to me that that leaves gaps in terms of the metadata

16   that would only be accessible through the devices that that

17   document resided on in the interim.

18        I may be mistaken.  I may be technologically confused,

19   but that is my understanding of not only what they're

11:53   20   requesting, but why they're requesting it and why that request

21   makes sense to me and why the cases on which you're relying

22   are -- speak to a different scenario.

23        MR. WILLIAMS:  So let me respond to that, Your Honor.

24   So first they knew what their allegations were at the time we

11:54   25   negotiated the joint discovery plan, and they insisted on the

1   different fields of metadata that they wanted us to include.

2   They knew those allegations.

3   THE COURT:  And I think those -- the metadata

4   certainly is adequate, it sounds adequate, and I don't think

11:54   5   they're complaining about it retroactively with respect to

6   documents that were produced.

7   MR. WILLIAMS:  But they've also received -- they

8   haven't just received a single copy.  You know, they have

9   received responsive documents from every custodian that has

11:54   10   them which identifies all of that same metadata.  So if

11   information is in defendant Jeremy Pizzola's possession but

12   it's also in another defendants' possession, they're getting

13   the metadata and that information from every custodian searched

14   which --

11:54   15   THE COURT:  With respect to its final resting place.

16   MR. WILLIAMS:  Well, it will show -- I mean, again, I

17   don't know where the final resting place -- I mean, it will

18   show who has possession or who had that in their possession.

19   But --

11:55   20   THE COURT:  Wait, wait.  Who had it in their

21   possession or have it.  Who had it in their possession at the

22   time of the inquiry, not necessarily people previously had it

23   in their possession.

24   MR. WILLIAMS:  Well, but if people previously had

11:55   25   it -- well, first of all, all of these documents to the extent

1    they were exchanged while these people were at UCSD, they have

2    all of that.  That's all on their UCSD servers.  There's no

3    question about that.  They have produced hundreds -- probably

4    hundreds of thousands of pages of information from their

11:55    5    servers, which are emails back and forth between all of these

6    because like any institution, they have a backup server where

7    all of this is maintained.  They have also received any emails

8    or exchanges of information that was exchanged between the

9    individuals at UCSD at the time and USC, including their

11:56    10   metadata.

11          But the more important issue is go back -- this is not

12   a theft of trade secret case or theft of intellectual property

13   case.  This isn't where you're taking proprietary information

14   and starting a competing business and you need to show did you

11:56    15   use this intellectual property.  They have disavowed trade

16   secret, copyright, all intellectual property claims here.  So

17   they hang it on this idea that well, we had a 502 claim for

18   computer crimes.  We don't -- USC and Dr. Aisen don't deny that

19   they are using the research data that is stored in the EDC and

11:56    20   that relates to these clinical studies.  We don't deny it.

21   We're continuing to manage the studies, and Judge Benitez found

22   that we're properly doing so when he denied their motion for

23   contempt.  He said the preliminary injunction anticipates that

24   we're going to continue to manage that.  So we're not denying

11:57    25   that we're using it.

1    So none of this -- this doesn't go to a damage theory

2  that they have.  It doesn't go to show that well, you used it

3  to build this better product and we're entitled to the profits

4  off that profit.  There is no relevance to it.

11:57    5    That's the other thing going on here.  So you find out

6  where it went.  What does that get you?  How is that relevant

7  to the case?  We admit that we backed up certain information.

8  We admit that we're still accessing the EDC and the data, and

9  we're using the data to manage these clinical studies.

11:57   10    So to go out on this expedition that's going to cost

11  hundreds of thousands of dollars easily in attorney time and,

12  you know, for what?  I mean discovery is now closed.  We're

13  getting ready to file summary judgment motions.

14    I come back to the Aisen example where they went

11:58   15  through this process.  They went through everything.  They did

16  not find a single thing that they're relying upon to say

17  ah-hah.  This was deleted, but we found it.  Their own forensic

18  expert testified that they have spent a million dollars

19  internally going around and forensically examining every device

11:58   20  that anyone associated with the ADCS ever touched on their own

21  that they have access to.  We haven't seen any smoking gun

22  document or information out of that.  They have everything they

23  need.

24    THE COURT:  So you talked about certain hard drives

11:58   25  that have been -- they were provided with the forensic imaging

1   of those.

2           MR. WILLIAMS:  Correct.

3           THE COURT:  That's four to five hard drives.  What

4   about the flash drives?

11:58   5           MR. WILLIAMS:  There was a flash drive that Ms. Tobias

6   testified to at deposition that she used to back up her emails.

7   We gave them a copy of that.  We identified in response to

8   interrogatories and also in response to RFPs any regulatory

9   information that was taken or copied.

11:59   10          THE COURT:  I'm interested in the devices that it is

11  your position they already -- that they don't need forensic

12  access to because they received a forensic image of it.

13          MR. WILLIAMS:  Any time in a deposition someone

14  mentioned a flash drive or a backup, and these are the two that

11:59   15  come to mind was Ms. Tobias, Ms. Shaffer, and that has been

16  produced, there's been a follow-up, and we've gone back, and

17  we've produced it, and to the extent it contained other

18  personal information on it, we did what we're obligated to do

19  as officers of the Court.  We reviewed it to make sure, and we

11:59   20  provided the documents to the extent that there was anything

21  unrelated or personal that was not responsive.  I don't

22  know -- I've not heard them identify any particular document

23  that -- or -- I mean device that they're aware of that we have

24  refused to provide them the information for.  If they did that,

12:00   25  we could have avoided this whole thing because we would have

1   produced a mirror image of it or we would have made sure there

2   wasn't anything personal on it.

3        THE COURT:  Do you have anything to say about the time

4   range?

12:00   5        MR. WILLIAMS:  I mean, it just goes again to the

6   overall issue which is the time range, particularly once

7   they've gotten to USC, you're going to have particularly issues

8   regarding privilege that are going to come up once they're USC

9   employees, and related to litigation, you're going to have

12:01   10  other issues, so if -- I think it's part and parcel of the same

11  process that we would have to go through.

12        THE COURT:  All right.  Anything that you want to

13  share with me with respect to the adequacy or inadequacy of the

14  privacy -- the protocol that was developed with respect to

12:01   15  Dr. Aisen's devices?

16        MR. WILLIAMS:  No, I think the one thing I will agree

17  with Mr. Romeo on is that special master Mr. Aquilina and his

18  team did a good job, but it was laborious.  I mean, they went

19  through, and they provided to us a listing of the files there,

12:01   20  they -- we would then go through and have to review each

21  document, and there were quite a bit of personal, private,

22  privileged, you know, family -- the bank account statements,

23  other things, tax returns that had to be redacted.  We provided

24  him that identification.  He would review to make sure he

12:02   25  agreed with it, which he did.  And then he made all those other

1    files available to them.

2          The problem here is just going to be we don't even

3    know -- until we identify which devices, we don't know what the

4    volume of these -- of data is going to be on it.

12:02   5          THE COURT:  Well, and there's the rub.  I mean, part

6    it is because I have now given an indication that I am inclined

7    to grant, but with a narrowing of the definition of which

8    devices are at issue, but I've got people arguing relative

9    burden and benefit, and everybody seems to be in the dark.  I

12:02   10   mean, without knowing how many devices we're talking about,

11   which of them were dedicated devices, which of them mixed use

12   devices, nobody can provide me with sufficient specifics for me

13   to do my job that I need to do it, and so I'm feeling like

14   everybody's at a disadvantage.

12:03   15         If you have a thought.

16         MR. WILLIAMS:  I was just going to say they talked

17   about the hard drives.  We've given them them.  They've talked

18   about flash drives.  All of these witnesses which they

19   acknowledge in deposition have blatantly admitted to these

12:03   20   things because they made copies of stuff.  If there are devices

21   that were identified in depositions or in other discovery that

22   they believe they have not been provided copies of or a

23   forensic image of --

24         THE COURT:  I'm not persuaded that that burden falls

12:03   25   to them.  In light of the evidence that they have from the

1    depositions, they have a good faith belief that there were

2    documents -- I'm sorry, devices through which the data at issue

3    in this litigation passed.  Now, whether all of them were

4    mentioned in deposition or not is not necessarily -- not -- it

12:04    5    is not necessarily the case that all of them would have been

6    mentioned in depositions.  That is information which is within

7    the control of the defendants in this case, not the plaintiff

8    in this case.

9        So it seems like the next step is based on a narrowed

12:04    10    definition of which devices we're talking about for USC to

11    identify the universe of devices that fall within that

12    definition and then determine of that universe which have

13    already been provided for forensic analysis if not the actual

14    device having been returned, then a forensic image of the

12:04    15    device having been provided.  So --

16        MR. WILLIAMS:  Your Honor, that begs the question.

17    What is the data?

18        THE COURT:  And we're going to turn to that in a

19    second.

12:05    20        Mr. Romeo, with respect to those devices, the hard

21    drives that were referenced where your client received the

22    forensic images, is that inadequate for those devices?  Do you

23    need the actual devices when you already received the image?

24        MR. ROMEO:  So with all due respect, I'm not sure what

12:05    25    Mr. Williams is talking about.  If you would turn to Exhibit G

1    of our motion -- this is just one example that comes to mind in

2    response to what he said.  And I'm not going to accuse him of

3    doing this intentionally, but Exhibit G is an email from Alex

4    Bergjans, who I'll represent is one of the dedicated associates

12:05   5    at Quinn Emanuel, counsel for USC, that is on this case, to us.

6    You can see the folks on my team, including Mr. Sharp.  This is

7    where we found out for the first time about the 4.5 terabytes.

8    You'll see that he carefully says we've provided you with the

9    contents, not the drives themselves.

12:06   10       So Mr. Zhao testified he went to Best Buy on May -- I

11   think it was May 23rd, which is Memorial Day weekend 2015, at

12   Ms. Tobias' direction, and bought four, he thinks four to five,

13   external hard drives.  He could not identify by serial number.

14   And he used those to copy the entirety of the CTMS, which is

12:06   15   our system.  It's not the EDC.  It doesn't have patient data,

16   although Dr. Buchanan testified that USC was justified to

17   possess it because it has a relation to the study, which is

18   wrong.  They haven't provided any devices themselves, so I --

19            THE COURT:  Or images of devices?

12:07   20            MR. ROMEO:  Correct.  That is my understanding, and I

21   could be wrong, but I think I'm right.

22            MR. WILLIAMS:  Your Honor, just the bottom of that

23   email chain makes it clear that we are planning -- if you turn

24   to page 79.

12:07   25            THE COURT:  Which Exhibit Number is it again?

| | |
|---|---|
| 1 | MR. WILLIAMS:  G. |
| 2 | THE COURT:  Thank you. |
| 3 | MR. WILLIAMS:  In the middle.  The email from Alex |
| 4 | Bergjans. |
12:07 | 5 | THE COURT:  What page are we on? |
| 6 | MR. WILLIAMS:  Oh, it says Exhibit G, page 79, page 3 |
| 7 | of the email. |
| 8 | THE COURT:  All right. |
| 9 | MR. WILLIAMS:  "Counsel, we are planning to messenger |
12:07 | 10 | two large hard drives to Laura Schwartz in Crowell's |
| 11 | Los Angeles office this afternoon."  He goes on to explain it |
| 12 | in the prior page, and in the response from Crowell Moring they |
| 13 | say, "We have had a chance to examine the contents of the hard |
| 14 | drives containing these production volumes."  The hard drives |
12:07 | 15 | were imaged and sent over to them. |
| 16 | THE COURT:  That's not what the email says. |
| 17 | MR. ROMEO:  And, by the way, what that is is we do |
| 18 | this all the time. |
| 19 | THE COURT:  I was talking. |
12:08 | 20 | MR. ROMEO:  I'm sorry, Your Honor. |
| 21 | THE COURT:  That's not what the email says.  Mr. Romeo |
| 22 | is right.  The email says that the volumes contain the contents |
| 23 | of the backup drives, not an image of the backup drives. |
| 24 | MR. WILLIAMS:  But the page we just looked at -- |
12:08 | 25 | THE COURT:  Right. |

1          MR. WILLIAMS:  Page 79.

2          THE COURT:  Right, two large hard drives.

3          MR. WILLIAMS:  We're planning to messenger two large

4     hard drives to Laura Schwartz.

12:08   5          THE COURT:  Right.

6          MR. WILLIAMS:  And then it also gives access to that

7     information through an FTP site, so I mean there were hard

8     drives physically messengered.

9          THE COURT:  Right, but this last paragraph that you're

12:08  10     pointing to doesn't say that the hard drives are the images.

11     That's consistent both with it being an imaged drive or with it

12     being a hard drive to which the contents of another drive had

13     been transferred, which is different from an image.

14          MR. WILLIAMS:  Okay.  I can just represent --

12:09  15          THE COURT:  You can represent that to me, but I don't

16     have the answer.

17          MR. WILLIAMS:  Okay.

18          THE COURT:  I don't know the answer.

19          MR. WILLIAMS:  If the issue is providing them forensic

12:09  20     images so that they can -- or providing them to the special

21     master so he can image them, we have no problem doing that,

22     Your Honor, because that was what we previously did.

23          THE COURT:  Okay.  So with respect to those four to

24     five hard drives, you're not opposed.  You either already gave

12:09  25     them the image or you're willing to give them the image?

                1          MR. WILLIAMS:  Correct.

                2          THE COURT:  Okay.  So that satisfies you?

                3          MR. ROMEO:  It seems like it would to the extent that

                4    the special master -- so I just want to make -- and I'm sorry

12:09           5    to burden you.

                6          THE COURT:  No, no, we don't -- we haven't gotten to

                7    what you're getting to now.  I mean, we don't know what the

                8    special master is going to be told to do with it yet.

                9          MR. ROMEO:  Oh, no, I just wanted to make sure we're

12:10          10    talking about the same image.  So I want -- we want to see the

               11    image Mr. Zhao bought from Best Buy that he then took with it,

               12    that Ms. Tobias and Mr. Pizzola then took with them to USC, and

               13    I would imagine they plugged it into the USC computer systems.

               14    We don't want just the contents of what was on there.  We want

12:10          15    the special master to see the four to five, whatever the number

               16    is.

               17          THE COURT:  Maybe not the original drive, but the

               18    images in exact forensic duplicate.

               19          MR. ROMEO:  I think they have the exact original

12:10          20    drive.  I would like the special master, because I don't know

               21    how -- what may be contained on an image, who imaged it.  I

               22    would rather Mr. Aquiline, just like he did with Dr. Aisen's

               23    laptop, take custody of the actual things that Mr. Zhao

               24    purchased from Best Buy in which he uploaded our information on

12:10          25    and he makes whatever image he wants of that, and that's what

1    we're fine with.

2         MR. WILLIAMS:  We will do that.

3         THE COURT:  Okay.  With respect to the four to five

4    hard drives.

12:11    5         MR. WILLIAMS:  Correct.

6         THE COURT:  Okay.  That's great.  We still need -- we

7    still need to address whatever other devices meet the

8    definition once we define the definition.

9         All right.  So I am persuaded that that portion of the

12:11    10   definition of the devices which goes to documents, devices that

11   only -- that would only be duplicated or only be forensically

12   examined would only fall into the definition by virtue of the

13   fact that they were used to communicate.  That will be out.

14        So let's focus on devices that were used to copy,

12:11    15   transfer, store, or communicate data or documents over which

16   UCSD had custody or control, and I did not circle back to the

17   original request to see how that was defined.

18        MR. ROMEO:  So the question in part is answered in my

19   declaration where I say, "During the meet and confer process,

12:12    20   we offered to narrow the requests."

21        THE COURT:  Uh-huh.

22        MR. ROMEO:  So we can look at the actual original

23   requests as well, but that's where the operative language

24   should be.

12:12    25        THE COURT:  Okay.  Point me to that.  It's in your --

1           MR. ROMEO:  Yes, it's in the moving papers.

2           THE COURT:  At page --

3           MR. ROMEO:  It's on page 2 of my declaration dated

4  November 1st, 2016, paragraph 10.

12:13    5           THE COURT:  All right.

6           MR. ROMEO:  You'll see in the original request it was

7  a little bit broader than that.  It didn't have the delimiters

8  of devices used to copy, store, communicate information stored

9  electronically over which we had possession, custody, or

12:13   10  control.

11           THE COURT:  All right.  So I think that Mr. Williams

12  raises a valid point that without narrowing "copy, store,

13  transfer, communicate data or documents," limiting it only by

14  those items over which UCSD once had possession, custody, or

12:14   15  control arguably casts too wide of a net in that, for example,

16  a personal device upon which a person had their work email

17  accessible would then be caught in this search if every email

18  that was once on UCSD's system was also once on this device, so

19  I think what you're really talking about is study data and

12:14   20  study documents that were copied, transferred, stored, or

21  communicated.  I think that's what you really want.

22           I'm not going to ask you to, you know, knock out a

23  definition right now that's going to capture what you want, but

24  it seems to me that that's what you're looking for, however

12:15   25  it's articulated, and that you're not intending to get to

1    everything on every subject.  Is that --

2              MR. ROMEO:  Right, so essentially what we know already

3    to date they did is they -- and, by the way, it goes to our

4    unjust enrichment claim that we've already had experts opine

12:15    5    on.  They have taken the contents of an entire research program

6    on these devices, and then they've also uploaded them directly

7    from UCLA's computer systems directly to the USC computer

8    systems, but they were able to take this, all of it, software,

9    study data, forms, protocols, protocols that Dr. Buchanan

12:15    10   testified took him at least two to three months to create

11   himself, computer system documentation, how to run the EDC, how

12   to run the CTMS, all of that was taken on these devices and

13   taken with them to USC, and I'm pretty sure the devices will

14   show they were inserted into the USC computer system, and

12:16    15   that's how USC was able to get up and running within less than

16   two months.  It just couldn't happen, so I don't know how to

17   define it.

18              THE COURT:  Well, you've come pretty close right now.

19              MR. ROMEO:  Okay.

12:16    20             THE COURT:  So I think if you sit down and you sit

21   down with your forensics people, you can come up with a

22   narrowing definition of what documents and data you're talking

23   about which is going to allow counsel for USC to identify what

24   devices we're talking about.

12:16    25             MR. ROMEO:  Okay.

1        THE COURT:  With this input, I think that I am -- I

2   don't think that I can rule today.  I think all I can do today

3   is tell you that I'm confirmed in my tentatives as to that,

4   carving out that scope.  I think I'm going to send the matters

12:17   5   to meet and confer on a number of issues.  A definition

6   of -- or limitations on what data or documents over which UCSD

7   had control, custody, control, are going to fall within this

8   definition.  Then USC is going to have to identify the devices.

9   With respect to each device, share with UCSD whether you

12:17   10  believe you already provided the device or whether they already

11  have it or whether it's still out in the universe, and if it's

12  out in the universe and they don't have a copy of it, what you

13  propose with respect to providing it.

14        Before you take a position, Mr. Romeo, on whether a

12:18   15  forensic image is sufficient or whether you need access to the

16  original, consult with your forensics expert.  I suspect that

17  you may find that he says no, if it's an image, it's an image

18  and we can work with that.  We don't need the original turned

19  over.  But I don't know.  Talk to your forensics person and

12:18   20  find out.

21        Next meet and confer about whether the protocol that

22  was worked out with respect to Dr. Aisen's devices is going to

23  be adequate or can be modified.  Once you know how many of the

24  devices potentially have multi- -- were put to multiple uses

12:19   25  and could have personal and private information and how much

1    data you think is on there, then do at least a rough

2    calculation about how much attorney time it's going to take to

3    go through the documentation that's pulled off of it.  Work out

4    what directive is going to be given to the forensic analyst

12:19   5    about what they're pulling off and putting into the computer.

6            And mindful that the parties are about to ramp up for

7    their pretrial conference, this is going to need to be done

8    very quickly, so can this be accomplished within the next week?

9            MR. ROMEO:  We will -- both sides have the resources

12:20   10   to do it, so we will represent that we'll get started maybe if

11   not later today, tomorrow, but we'll have it done within a

12   week.

13           MR. WILLIAMS:  Your Honor, the only issue is until we

14   agree on the definition of the data, we're not going to be able

12:20   15   to identify which devices, so --

16           THE COURT:  So focus on that first.  Try to get that

17   knocked out today.

18           MR. ROMEO:  If not today, we'll say by noon tomorrow,

19   we will get -- we will reach a consensus on that definition.

12:21   20           THE COURT:  Okay.

21           MR. ROMEO:  Just because I think time is short.

22           MR. WILLIAMS:  Your Honor, if for some odd reason we

23   can't reach a consensus with regard to that, how would we -- in

24   terms of trying to set a call --

12:21   25           THE COURT:  Yeah, because that is the first step.  And

         1   you need to reach agreement on that before the rest can play

         2   out or else have me weigh in on it, so I don't know if I

         3   brought my calendar with me.  Do you have a device with my

         4   calendar?  Oh, you have it.  That's tomorrow.  Okay.  Why don't

12:21    5   we set this for -- tentatively set it for a conference call at

         6   let's say -- let's do it late morning.  Let's say 10:30.  Is

         7   10:00 too early?  Will you know by 10:00.

         8         MR. WILLIAMS:  10:00 is better -- well, from a

         9   scheduling standpoint, but I guess in terms of working this

12:22   10   out.

        11         MR. ROMEO:  I wasn't -- so I don't think this is going

        12   to be that complicated.

        13         THE COURT:  Right.

        14         MR. ROMEO:  So I would -- if that's more convenient

12:22   15   for the Court, we'll do that, as long as they'll just openly

        16   communicate with us.

        17         THE COURT:  You have availability to work with them on

        18   this today?

        19         MR. WILLIAMS:  I'm traveling, but I can talk this

12:22   20   afternoon.  I would suggest if they want to send us a proposed

        21   definition, then we could kind of work on tweaking that.

        22         THE COURT:  Okay.  All right.  We're going to

        23   tentatively set it for a call at 10:00, and then contact my

        24   court by about 9:30 whether we're going to need to have

12:22   25   the -- I said "my court," but I meant my chambers -- whether

1    we're going to need to proceed with that or whether you have

2    that worked out.  And then if you've got it worked out or if I

3    have to make a determination on that tomorrow morning, I'll do

4    it directly so that you can continue your work, and then by a

12:23    5    week from today, hopefully you'll have addressed all of those

6    issues, and then please send me a status report.  It doesn't

7    have to be -- if you're in agreement, it does not have to be

8    detailed.  If you're not in agreement, then I'm going to need

9    sort of a fairly detailed position -- a fairly detailed

12:23    10   explanation of the position of the two sides on each of the

11   issues that I raised.

12            MR. WILLIAMS:  When would you like that by,

13   Your Honor?

14            THE COURT:  Well, a week from today would be the 12th.

12:23    15   Can you do it by noon on the 12th?

16            MR. WILLIAMS:  Sure.  We'll also be here on the 11th

17   as well.

18            THE COURT:  Oh, yes, you'll be here on the 11th.  Good

19   point.  Good point.  Yeah, why don't you try to get it to me so

12:24    20   that we can address it on the 11th after our settlement

21   conference if we need to.

22            MR. ROMEO:  Okay.  So maybe by the day before -- the

23   10th?

24            THE COURT:  Late -- any time on the 10th, even if it's

12:24    25   late.  I'll look at it in the morning before my morning

1   business.

2          MR. ROMEO:  Okay.

3          THE COURT:  I mean earlier is better, but I'm mindful

4   of the fact that you're going to need to consult with experts

12:24   5   and there's some heavy lifting to be done.

6          MR. ROMEO:  And I'm hoping, though, with the Court's

7   very specific guidance offered today that hopefully if there is

8   a dispute, it will be a narrow one.

9          THE COURT:  Good.  I'm hopeful too.

12:24   10          All right.  Anything else we should address?

11          MR. WILLIAMS:  Your Honor, I have one question.

12          THE COURT:  Yes.

13          MR. WILLIAMS:  Housekeeping.  For the 11th, will it be

14   conducted similar to the ENE, or are you expecting the parties

12:24   15   to do any kind of opening presentation or --

16          THE COURT:  No, I'm not expecting an opening

17   presentation.

18          MR. WILLIAMS:  Okay.  Okay.  Thank you, Your Honor.

19          MR. ROMEO:  Thank you.

12:25   20          THE COURT:  Thank you everyone.

21                          ---000---

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-I-O-N

2

3           I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6           Dated January 6, 2017, at San Diego, California.

7

8

9                         /s/ Dana Peabody
                          _____
10                        Dana Peabody,
                          Registered Diplomate Reporter
11                        Certified Realtime Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25